COOPER et al. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. November 25, 1925.)

No. 6607.

1. Criminal law ⬰394—Evidence obtained by government officers in inspecting corporate books to verify tax returns admissible in prosecution against officers of corporation.

Where government officers, with consent of corporation, obtained access to books and papers of corporation in order to verify tax returns it had made, held, that information thus obtained was properly admitted in prosecution of officers of corporation for conspiring to defraud government by filing false income and excess profits tax returns; there being no violation of either the Fourth or Fifth Amendment to the United States Constitution.

2. Criminal law ⬰1168(1)—That government officers inadvertently obtained private papers while inspecting books of corporation held not to require reversal of conviction, in view of court's ruling holding them incompetent and testimony that they were not used nor relied on.

Fact that government officers, in inspecting books and papers of corporation to verify its tax returns, inadvertently obtained certain private papers, held not to require reversal of conviction of officers of corporation for conspiring to defraud government by filing false tax returns of corporation, where court ruled such private papers incompetent, and government officers testified that all such papers were returned, and not used nor relied on; it appearing further that such officers had other sources from which the same information was obtained.

3. Conspiracy ⬰47—Overt act of subscribing and swearing to false tax returns held sufficiently proven.

In prosecution of officers of corporation for conspiring to defraud government by filing false income and excess profits tax returns of corporation, testimony of notary public, whose jurat was attached to returns, held sufficient to prove overt act of subscribing and swearing to the returns.

4. Conspiracy ⬰47—Evidence held sufficient to prove that defendant corporate officers filed or caused false returns to be filed.

In prosecution of corporate officers for conspiring to defraud government by filing false income and excess profits tax returns of corporation, evidence that defendants signed returns in due course and according to usual custom, and that they were filed with proper government official, raised legal presumption that defendants filed or caused returns to be filed, especially as they were proper officers of corporation to make, verify, and file such returns.

5. Conspiracy ⬰47—Facts held to warrant inference that defendants had knowledge of contents of false tax returns.

Where defendants, prosecuted for conspiring to defraud government by filing false income and excess profits tax returns of corporation, were sole owners and in sole charge of business, with duty of making returns under oath, held, that such facts entitled jury to infer that defendants had knowledge of contents of tax returns.

6. Criminal law ⬰434—Corporation books held admissible in prosecution of officers for filing false tax returns of corporation.

In prosecution of corporate officers for conspiring to defraud government by filing false income and excess profits tax returns of corporation, held, that books of corporation were

admissible, as tending to show what the taxable income of the corporation was represented to be.

**7. Criminal law ⬠398(2)—Summaries obtained by expert accountants from corporate books held admissible, where books present and available for purposes of cross-examination.**

In prosecution of corporate officers for conspiring to defraud government by filing false income and excess profits tax returns of corporation, summaries of accountants and government experts, obtained from books of corporation, were properly admitted, where books were present and kept at hand for purposes of cross-examination, and for purpose of offering any portions deemed material.

**8. Criminal law ⬠434—Proper to have recourse to books of corporation covering previous years, where necessary to verify entries found during period for which alleged false tax returns were filed.**

In prosecution of corporate officers for conspiring to defraud the government by filing false income and excess profits tax returns of corporation for certain years, it was proper to have recourse to books of corporation covering previous years, where such recourse was necessary to verify or explain entries found during periods in controversy.

**9. Criminal law ⬠438—Photostatic copies of government documents, duly authenticated, properly admitted.**

Photostatic copies of government documents, duly authenticated, are accepted instrumentalities of introducing official records, and tax returns are public records, filing and preservation of which are official acts.

**10. Criminal law ⬠1169(2)—That witnesses permitted to testify from photostatic copies of tax returns not ground of complaint, where such fact sufficiently established from other testimony.**

Defendants cannot complain because witnesses were permitted to testify to signatures of defendants affixed to photostatic copies of tax returns, where signature of defendants and fact that they signed returns was sufficiently established from other testimony.

**11. Conspiracy ⬠33—Previous actions of government officers in assessment of tax returns held not binding on government.**

Previous action of government officers by way of assessment, in recognizing propriety of treating certain other business as that of corporation, officers of which were prosecuted for conspiring to defraud government, by filing false tax returns of such corporation, *held* not binding on government, where contrary situation involving fraud was disclosed.

**12. Internal revenue ⬠7—Insurance received to cover loss by fire to be included in tax return, where loss deducted from prior return.**

Where loss suffered by corporation by reason of fire was deducted in making tax return, on subsequently receiving insurance covering such loss, such sums should have been included in its subsequent returns.

**13. Criminal law ⬠671—Witness properly interrogated by court, in absence of jury, in determining admissibility of testimony.**

Court, interrogating witness, while seeking conclusion as to ruling to be made on admission of certain testimony, properly did so in absence of jury.

**14. Conspiracy ⬠47—Criminal law ⬠306—Conspiracy may be established by circumstantial evidence and this is not building one presumption on another.**

Conspiracy may be established by circumstantial evidence, and such method does not amount to building of one presumption on another.

**15. Conspiracy ⬠43(12)—In prosecution for filing false tax returns, only necessary to show that some amount due, and that returns knowingly false in that respect.**

In prosecution of corporate officers for conspiring to defraud government by filing false income and excess profits tax returns of corporation, it was not necessary that proof of amounts of income and excess profits and taxes due thereon measure up to amounts stated in indictment, but it was necessary only that it should appear that some amount was due, and that returns were knowingly false and fraudulent in that respect.

**16. Conspiracy ⬠48—Refusal to instruct that corporate officers are not responsible for clerical errors on part of employees in making tax returns held error, in view of evidence.**

In prosecution of corporate officers for conspiring to defraud the government by filing false income and excess profits tax returns of corporation, in view of confusion that might have existed in minds of jury by reason of testimony as to errors in books of corporation which had been corrected by accountants, refusal of defendants' requested instruction that defendants should not be held responsible for mere clerical errors and omissions on part of employees was error.

**17. Conspiracy ⬠48—Charge held not to have clearly presented important defense to jury.**

In prosecution of corporate officers for conspiring to defraud government by filing false income and excess profits tax returns of corporation, wherein defense was that loss sustained by a partnership composed of both defendants was properly deducible in making corporation's returns, because such partnership was merely the selling agency of the corporation, and prosecution claiming that such partnership was entirely distinct from corporation, *held*, that court's charge on such question, and its subsequent remark on objection to charge, did not clearly present such question to the jury.

**18. Conspiracy ⬠48—Refusal to instruct that defendants, filing tax return pursuant to regulation, not guilty of criminal intent because of later regulation changing rule, held error, in view of defendants' apparent good faith in making return.**

Where officers of corporation, prosecuted for conspiring to defraud the government by filing false income and excess profits tax returns

of corporation, might, in view of a certain tax regulation, in good faith have believed that it was proper to enter sum, received by corporation from government in 1919 as compensation for cancellation of war contract, on the 1918 return, instead of the 1919 return, *held*, that refusal of requested instruction that subsequent change in regulations would not make defendants' action illegal, and that criminal intent could not be imputed to them because of a later regulation, was error, especially as court's charge contained no advice on question of honest belief, good faith, and want of criminal intent on part of defendants in their treatment of this item.

19. **Criminal law ⬳778(4), 1173(2)—Refusal to instruct that indictment was not evidence of guilt, and that jurors should not be influenced by return of indictment, held reversible error, where court's charge contained nothing to same effect.**

Refusal of defendants' requested instruction that indictment is of itself a mere formal accusation, and not to be considered as evidence of guilt, and that jurors should not suffer themselves to be influenced by fact that indictment was returned against defendants, where court's charge contained nothing to same effect, *held* error, and to require reversal.

20. **Conspiracy ⬳45—Admission of testimony as to transaction occurring before conspiracy charged existed held error.**

In prosecution for conspiring to defraud the government by filing false tax returns, admission of testimony that, nearly two years prior to conspiracy charged, one of defendants asked witness to change an inventory by cutting it in two, was error.

21. **Criminal law ⬳433—Letters held competent and material, and their exclusion error.**

In prosecution of corporate officers for conspiring to defraud the government by filing false tax returns of corporation, wherein defense was that loss suffered by copartnership composed of defendants was properly deducted in making corporation return, because such copartnership was the selling agency of the corporation, *held*, that letters retained by one in charge of lands purchased by partnership, which tended to show identity of defendants' enterprises, under whatever name they were operated, were competent and material, and their exclusion was error.

In Error to the District Court of the United States for the Northern District of Iowa; George C. Scott, Judge.

William F. Cooper and another were convicted of conspiring to defraud the United States of its revenues, by filing of false income and excess profits tax returns of a corporation, and they appeal. Reversed, and new trial granted.

See, also, 288 F. 604.

Denis M. Kelleher, of Ft. Dodge, Iowa (Richard F. Mitchell, of Ft. Dodge, Iowa, and Glenn Brown, Frank R. Lacy, and Robert W. Clewell, all of Dubuque, Iowa, on the brief), for plaintiffs in error.

G. P. Linville, U. S. Atty., of Cedar Rapids, Iowa.

Before STONE and VAN VALKENBURGH, Circuit Judges, and PHILLIPS, District Judge.

VAN VALKENBURGH, Circuit Judge. April 5, 1922, there was returned, in the District Court of the United States for the Northern District of Iowa, an indictment against plaintiffs in error, William F. Cooper and Austin A. Cooper, respectively president and secretary-treasurer of A. A. Cooper Wagon & Buggy Company, a corporation, charging them with having unlawfully conspired and agreed together and with each other to defraud the United States of its revenues. The conspiracy in the first count concerned the income and excess profits returns of said corporation for the calendar year 1918, and the conspiracy was alleged to have existed from January 1, 1919, continuously down to and including the 29th day of April, 1919. The third count concerned the income and excess profits returns of said corporation for the calendar year 1919, and the conspiracy was alleged to have existed from January 1, 1920, continuously down to and including the 14th day of April, 1920. The fifth count concerned the income and excess profits tax for said corporation for the calendar year 1920, and the conspiracy was alleged to have existed from January 1, 1921, continuously down to and including the 14th day of April, 1921.

In setting forth the nature of the conspiracy it was alleged that the said defendants would prepare and cause to be prepared incorrect, false and fraudulent income and excess profits tax returns for the calendar years above named for and on behalf of the said A. A. Cooper Wagon & Buggy Company, which said income and excess profits tax returns would show that the amount of the gross income, less the deductions and credits allowed by law of the said corporation for such calendar years, resulted in a loss to said corporation in a large amount stated, and would show that there were no income or excess profits due to the United States for such taxable years; whereas, in truth and in fact, as said defendants and each of them well knew, the amount of the gross income of said corporation, less the deductions and credits allowed by law, upon which said corporation was liable for

income and excess profits to the United States, was in a large stated amount, and that the amount of the income and excess profits taxes due upon such amount of annual net income for said calendar years was a large stated amount; that it was further a part of said conspiracy, that said incorrect, false and fraudulent returns, so to be prepared, should be sworn to as required by the act of Congress and the regulations promulgated thereunder; that the said defendants and each of them should swear to said incorrect, false and fraudulent returns and that the same should be filed with the collector of internal revenue for the proper revenue collection district of Iowa; and that no taxes should be paid to the said collector as due and owing thereon, thereby defrauding the United States out of a large amount of money. As overt acts it was alleged, first, that the said defendants did subscribe and swear to said returns; and, second, that they filed and caused them to be filed as aforesaid. These allegations, both as to the nature of the conspiracy and as to the overt acts, were the same in all three counts. The trial resulted in conviction, and fines were assessed thereunder.

The A. A. Cooper Wagon & Buggy Company was a corporation organized under the laws of the state of Iowa, with its principal office in the city of Dubuque in that state. It had a factory there, and was engaged in the manufacture and sale principally of wagons, buggies, sleighs, and the like. Its business was conducted as know to the trade, under a number of trade-names, to wit, under the corporate name, "The A. A. Cooper Wagon, Sleigh & Awning Company," "A. A. Cooper Wagon, Awning & Sleigh Company," and "Cooper Wagon Company." In the office of the corporation were kept letter heads, invoice heads, and printed and typewritten matter used in that office, having each of those names thereon. It was testified that "no separate or other office force was employed, in connection with these matters, than the regular office force, and no separation or distinction was made, so far as the office force was concerned, of the conduct of the business carried on under these several trade-names." It was also shown that there was installed in the state of Texas a business under the name of "Cooper Manufacturing Company," which was stated to be a partnership—presumably, as can be gleaned from the record, composed of the two plaintiffs in error. The nature of this business enterprise—that is to say, its connection or disconnection with the A. A.

Cooper Wagon & Buggy Company—is the storm center of this prosecution.

The government contends that it is an entirely separate and distinct entity, whose income, profits, or losses have no bearing upon those of the corporation, but are those of the partnership, composed of William F. Cooper and A. A. Cooper individually. The contention of the plaintiffs in error is that this was but a branch of the parent company; that it was organized and did business in Texas as a partnership, to avoid certain onerous provisions of the laws of Texas relating to corporations; that the so-called Cooper Manufacturing Company was financed by the Wagon & Buggy Company; that checks were drawn on it to pay wages in the factory at Dubuque, and that moneys resulting from sales were transferred to the Wagon & Buggy Company; that the salesmen were in the employ of and paid by the corporation; that in the later years some of the wagons shipped to Texas were traded for horses, mules, and other animals, which were also taken in payment of notes; that this stock was kept at what was called the "C Ranch," in charge of one Merritt; that in 1917 it was decided that it would be profitable to lease some land in Texas, upon which this stock was placed, and, in general, that Cooper Manufacturing Company, the Texas partnership, was merely an instrument through which the product of the Wagon & Buggy Company was sought to be sold and disposed of in interstate trade.

There was testimony in support of these claims and no direct testimony to the contrary—the government basing its contention chiefly upon the distinct legal status heretofore stated, and the fact that the operations of the Texas business were not carried upon the regular books of the Wagon & Buggy Company. It appears that they were entered principally in certain so-called trailing account books; therefore the government refused, in computing the income and profits of the Wagon & Buggy Company, to consider the large losses that were suffered in Texas. It is conceded that, if what is known as the Texas business, conducted in the name of Cooper Manufacturing Company, was a part of the business of the parent corporation, there was no taxable income. If no such relationship existed, if the two enterprises were distinct, there was taxable income. This, as has been said, is one of the critical questions in the case. The evidence upon this point is very gingerly treated in the briefs. Counsel for defendant in error contents himself with say-

ing that the record "teems" with so much testimony to the effect that this was a separate enterprise that he will not burden the court by reciting it or pointing out the record pages.

Plaintiffs in error say that the identity of the Manufacturing Company, as a sale adjunct and agency of the Wagon & Buggy Company, is established by testimony introduced by the government, and is uncontradicted; that the contrary is established, if at all, only by the assumption of expert accountants, based upon an examination of unauthenticated books of the Wagon & Buggy Company, and the testimony of witnesses that goods were shipped to the Cooper Manufacturing Company, or, generally, in the name of the Cooper Wagon Company, one of the trade-names of the parent corporation, and upon the further assumption that these were sales instead of consignments, and that the Wagon & Buggy Company received the assumed purchase price, for which it has failed to account. It is further urged that these books of the Wagon & Buggy Company could not be received by the court as binding upon the defendants, nor at all, without a showing that they were properly kept, because they were the books of a third party, to wit, the corporation, and not of defendants. Also it is urged that these "trailing account books" were not included in the presentation made by the government, and thus that the entire bookkeeping system was not before the jury. They complain, further, that the government's experts were permitted to introduce summaries, which were not mere reflections of the books themselves, but were expressions of opinion of the experts as to the state of the books, and the existence of taxable income, and that these experts made corrections in the books to the extent, in one instance, of disallowing an item in excess of $5,000 charged for depreciation, and arbitrarily disallowed certain expense items, and in this manner placed before the jury, not the showing of the books themselves, but their own views as to that showing, or what that showing should be, thus invading the province of the jury, and eliciting a verdict not founded upon competent evidence.

It must be confessed that both the record, and its presentation in brief and argument, are not entirely satisfactory. Both have been confused, instead of clarified, by extended insistence upon minor matters. In a record of 1,000 pages it would be strange if there should not creep in some slight deviation from strict rule. The trial lasted over four weeks. We must, if we can, determine whether the result reflects substantial justice or has been reached through an unwarranted invasion of the rights of defendants in a criminal case.

[1] At the threshold it is claimed that the indictment should have been quashed because of the alleged submission to the grand jury, of certain private books and papers of the defendants unlawfully seized, in violation of the Fourth Amendment, and that at the trial such evidence, and information elicited from clues derived therefrom, were introduced, contrary to the provisions of the Fifth Amendment. To this contention it may be answered that there was no such search and seizure as is contemplated by the constitutional prohibition. Government officers, under the applicable revenue law, demanded access to the books and papers of the corporation, in order to verify or discredit the returns it had made, and neither force, threats, nor other objectionable methods were employed. The corporation, without objection, answered and complied with the demand for inspection and examination and aided and participated therein. It was compelled by law to make the disclosures that were made, and could not, of course, make this objection in any case; nor can plaintiffs in error, as officers of that corporation, plead it in their own behalf. Information thus gleaned may always be used in the prosecution of individuals responsible for the violation. Besides, there was before the grand jury other substantial evidence conceded to be competent and free from taint. Therefore, under general authority, the indictment is not vulnerable on this ground.

[2] We are concerned, then, only with the use of evidence at the trial. Of course, in the case of seizure wrongful under the provisions of the Fourth Amendment, and resulting in compelling a defendant to give testimony against himself, contrary to the spirit of the Fifth Amendment, inquiry must be granted to determine how far, if at all, the injury has gone; but here, as has been stated, there was no such original unlawful seizure. It is conceded that some private papers came to the hands of the revenue officers; but this in itself is no vice of which complaint can be made. The government agents made no demand for such, and it would appear that they must have been turned over inadvertently by the defendants or their employees. They were not held, and it is testified that they were not used.

At the trial no such paper can be used against objection; but surely the burden does not shift to the government to purge itself of all knowledge of such private documents, which came to its hands through no actual usurpation of power. The court having ruled that no private papers nor information therefrom could be used, the government officers having testified that all such were returned, and not used, nor relied upon, and the court having granted a hearing upon this point, we must conclude that we are not justified in setting aside the verdict because of this alleged taint.

Counsel for defendants sought at the hearing to conduct an extended and searching inquiry into the source of each probative fact introduced by government agents, in the hope of eliciting proof, thus indirectly, that clues had been obtained from private documents. The theory of counsel and court are disclosed by the following colloquy during that hearing:

"The Court: Let us assume, now, that you find a letter, or a copy of a letter, that has been written, and it suggests to you that the clue was furnished by a private document, and you find a private document, which might have been a clue sufficient for the purpose, how are we to determine whether the clue was obtained there or elsewhere?

"Mr. Kelleher: It is our view that, if we are able to make that identification, and to show that there were among the letters and papers improperly taken or inspected that source of information, then the presumption is that the information thus obtained from following that clue is illegally obtained.

"The Court: I don't think the court would go that far with you. I think it must appear that the document or paper was a private document, obtained through coercion or illegal action, and that any evidence offered, resting entirely upon that document as a foundation, would follow the document; but, merely because the document contained a clue which might have been followed out in company with numerous other clues, which were available, I hardly think that would exclude the evidence so discovered."

Under the circumstances of this case, we think the position of the court was sound.

[3] It is insisted that the overt acts charged in the indictment were not proved. These were two in number: (a) Subscribing and swearing to the returns; and (b) filing and causing the same to be filed. As to the first, Thomas E. Rafferty, a notary public, whose jurat is attached to the returns, testifies that he did not see plaintiffs in error sign their names and that they did not formally make oath thereto. The returns prepared were left on his desk, as was customary with all business of that kind. He would see notations on his desk, or slips attached with the notation, "For Mr. Rafferty; please sign and return." He never considered it necessary to swear those connected with the office in their own work. About the only notary work he did was for the office, in connection with papers coming to his desk. He presumed they were all right, but was not in the habit of swearing the signers and did not swear them.

"The Court: Was that because you recognized the signatures? A. Because I recognized the signatures? Well, I would recognize the signatures, and I certainly knew they would not be giving me anything to sign in the office I thought was not all right to be signed.

"Q. Well, did you recognize their signatures on Exhibit 1a? A. Well, I did; yes; but now another thing: Sometimes there would only be one signature on these income tax reports, and maybe W. F. Cooper would be on the outside with me, and come in in the evening, and I would find it on my desk, and simply tell him, 'Here is a paper left for you, W. F., to sign.'

"Q. You would see him sign it? A. No; he would take it to his desk.

"Q. You saw him take it to his desk? A. Yes.

"Q. And bring it back? A. He might bring it back, and I would leave it on the desk, where I was requested to leave it.

"Q. It was signed when he brought it back? A. It was signed when he brought it back; yes.

"Q. Now that is your explanation as to Exhibit 1a? A. The same procedure would follow them all. In all of the returns the same procedure. The signatures on the second sheet of Exhibit 1c (photostatic copy of purported return for 1918) are W. F. Cooper, A. A. Cooper, and my own, Thomas E. Rafferty. * * *

"My signature is attached as notary public under the language, 'Sworn to and subscribed before me this 14th day of April, 1920.' I recognized their signatures at that time."

The foregoing discloses the manner in which the purported swearing to the returns took place. It was conceded that the returns were made and that they came to the notary from the hands of the officers or un-

der their direction. This method of swearing members of the same business establishment, while informal and technically not in conformity with law, is all too prevalent, and, as this witness states, was the usual course of procedure in that office. The defendants were not on trial for perjury, and in our judgment the evidence to sustain the first overt act was sufficient for the purposes of this case. The responsible officers of this corporation should not be permitted to avail themselves of their failure to observe technical procedure, especially when the instrument filed is one demanded by law and tendered in discharge of that obligation.

[4] As to the second overt act charged, the criticism is that it is not shown that the defendants themselves filed the returns with the collector of internal revenue. It is shown that they signed them in due course and according to the usual custom. They were made for filing in accordance with the provisions of law; they were filed with the proper government official. Plaintiffs in error were the proper officers of the corporation to make, verify, and file such returns. The legal presumption is that they filed or caused them to be filed. Numerous cases concerning letters finding their way into the mails establish this rule.

[5] But it is claimed that knowledge on the part of the defendants of the contents of the returns is not shown; that they may have been made up by employees, without personal knowledge on the part of the Coopers. It was shown that defendants were the sole owners of the corporate stock. The corporation was a family affair. They were in sole and entire charge of the business; upon them was enjoined the duty of making these returns under oath. The owner of a business need not be the actual bookkeeper, to be familiar with the affairs and finances of that business. It would present a somewhat startling situation if a taxpayer, charged by law with this duty, could sign and file a false return, made to defraud the government, and escape punishment by disclaiming knowledge of that which he has sponsored. Of course, he would not be liable for innocent clerical mistakes; but he must be held to know that which it is his duty to know, and which he solemnly promulgates. We do not by this recognize imputed or presumed knowledge or intent. We merely hold that the situation presented is one from which the jury was entitled to infer knowledge on the part of the defendants.

[6-8] It is urged that the books of the corporation should not have been admitted in evidence, because they were those of a party other than the defendants and were not sufficiently authenticated. As to these books it may be remarked that, while not those of the defendants individually, they are the books of the corporation of which defendants were officers, and whose taxable income they are charged with conspiring to conceal; therefore they would be admissible, as tending to show what that income was represented to be. It is true that their reliability must be established if their showing is to be taken as true; but, with respect to the lack of authentication, it may be noted that these were the books placed in the hands of the government as the books of the corporation from which its tax returns might be verified, and the later contention of the government refuted. They were audited by expert accountants at the instance of the corporation itself. These accountants found errors and made corrections. The government experts took these books and the work of these accountants, and made summaries showing the status from the original books, from the books when corrected, and also the showing after applying other items purporting to be disclosed by the testimony of other witnesses. They told as experts what the footings would be as a matter of computation, and what the effect in figures would be if certain items were received or rejected. The jury was left to draw its own conclusions from this and other testimony. The charge of the court clearly stated to the jury the force that should be given to the books and to this expert testimony.

"As I have stated, gentlemen, a material fact, incumbent upon the government to establish in connection with each of the three counts submitted to you, is that the A. A. Cooper Wagon & Buggy Company had taxable income for the years specified in the respective counts. For the purpose of establishing this fact, as appertaining to each of the particular years 1918, 1919, and 1920, the government has produced, identified, and introduced in evidence certain books, records, papers, and documents of the A. A. Cooper Wagon & Buggy Company, claimed to have been kept and used by that corporation in its business. These books, records, papers, and documents are competent evidence in the case, so far as they may tend to prove or disprove the fact as to whether said corporation had taxable income during any or all of said respective years, and you

will consider these books, records, papers, and documents admitted in evidence, in connection with other testimony and evidence, in determining such fact in respect to each of said years. The government has also offered and introduced the testimony of a large number of witnesses as to sales and transactions which the government claims are not shown upon the books of the A. A. Cooper Wagon & Buggy Company, and this class of testimony you will also consider in connection with the books, records, papers, and documents and other evidence introduced upon the trial, in determining the question of taxable income of said corporation for each of said respective years. The government has also offered in evidence the testimony of accountants and summaries of entries and accounts testified by such accounts to have been prepared and formulated from the books, records, papers, and documents, and, in some instances, in part from assumptions based upon the testimony of other witnesses. The testimony of these accountants, and the summaries prepared by them and admitted in evidence, are competent for the purpose of proving the facts disclosed by such books, records, papers, and documents. However, such summaries have no probative force in and of themselves, except as they reflect the facts and figures shown by the books, records, papers, and documents, and other testimony from and upon which they are formulated. The purpose of using this form of evidence is a matter of expediency, and designed to avoid the inconvenience and difficulties attendant upon examination and inspection on the trial of many and voluminous books and documents. These summaries should therefore be considered by you for the purpose which I have indicated, in connection with all other pertinent facts and circumstances in evidence on the trial."

The rule is thus well stated in Ruling Case Law, volume 11, page 630:

"Where complicated books of account are in evidence, and elaborate computations are necessary to determine the results and amounts evidenced by the books, an expert may be called upon to make such computations, and state them to the jury. But his conclusions must not involve the determination by him of controverted questions either of fact or of law; and the assumptions of fact, if any, on which his computations are based, must be clearly stated in his evidence, so that the jury can reject or modify his results, if they do not find proven the facts on which such results are based. And it is never proper for an expert simply to testify that the books show certain facts. The books themselves must be introduced as primary evidence, and the testimony of the expert is secondary and explanatory only."

This rule was observed by the court, which announced that, while it was not absolutely necessary in each case to introduce the records themselves, they must be held available for purposes of cross-examination, and for the purpose of offering any portions deemed material. The books were present, and were kept at hand, for that purpose. Of course, it was proper to have recourse to the books of the company covering previous years, where that was necessary to verify or explain entries found during the periods in controversy. The foregoing sufficiently states our views with respect to the summaries of experts that were introduced, of which counsel for plaintiffs in error makes complaint.

[9, 10] Exception is taken to the introduction of photostatic copies of the government documents forming the basis of the prosecution. Photostatic copies of government documents, duly authenticated, are now the accepted instrumentalities of introducing official records. Tax returns are logically public records, and made so by the revenue law. Their filing and preservation are official acts. From these, witnesses were presented to testify to the signatures of the defendants affixed thereto. We incline to the view that this is permissible; but, in any event, the signatures of the defendants and the fact that they had signed the returns in question were sufficiently established from other testimony.

[11] Another contention is that the agents of the government, prior to the institution of this prosecution, had recognized the propriety of treating the Texas business as that of the corporation, and, perhaps, in some other particulars had acquiesced in features of these returns. But it is fundamental that any previous action of this nature on the part of officers, by way of assessment, based upon the apparent situation disclosed by the taxpayer in his proofs, cannot bind the government, when a contrary situation involving fraud is disclosed. No contractual relation is involved. The jury, however, might well consider such action in arriving at the intent of the defendants, and as bearing upon their good or bad faith in the premises.

[12] During one of the taxable periods involved the corporation suffered a considerable loss by fire, causing a corresponding

diminution of its physical property reflected in its returns. It subsequently received payment in a sum exceeding $79,000. It did not include this in making its subsequent returns, on the ground that it was not income in the accepted sense, and therefore imposed upon it no legal requirement to report it. The agents of the government insisted that this amount should be included. In this we think they were correct. Under the circumstances shown the property burned being deducted from inventory, the amount received from insurance stood in its place, and should have been added. While not income in a strict sense, it is at least a part of the property of the corporation, which should enter into the determination of excess profits.

[13] It is objected that the court interrogated the witness McCann in the absence of the jury, while seeking a conclusion as to a ruling to be made upon the admission of certain testimony. This is usual procedure, for the protection of the defendant against the effect of prejudicial remarks, sometimes made in the course of discussion. The jurors are concerned only with the effect of testimony admitted, not with the reason which moves the court to admit it. That reason should come properly, if necessary, through the charge, and not through the doubtful interpretation of a discussion.

The defendants made many requests for instructions, which were by the court refused, for the reason that it conceived that such as were proper were covered by the charge; at the close it was understood that exceptions were preserved to the refusal of such requests. Counsel for plaintiffs in error then said: "In order to preserve our exceptions to the portions of the charge dealing with the several matters covered by our request, I understand it will not be necessary at this time to repeat these requests, or formally object or except to the statements in the court's charge on the same subject-matter." And again: "So that, in order to preserve exceptions to the refusal to charge upon any of the points covered by the several requests, and to the portions of the charge dealing with the matters covered by our requests, it will not be necessary to call any further attention to that now by way of any further formal exception." To which the court answered, "No." In such case it would seem to have been understood that an exception was preserved, not only to the refusal of requests, but to any part of the court's charge upon the same subject-matter which was deemed erroneous.

[14] Upon the subject of conspiracy, as indeed in most other particulars, the charge of the court was exceptionally clear and comprehensive. Conspiracy was excellently defined. It is practically always established by circumstantial evidence, and this method in no sense amounts to the building of one presumption upon another. The attack upon this ground is a novel one, which, if indulged, would grant immunity to conspirators in nearly all cases. The jury was told that the evidence on the whole must not only be consistent with defendants' guilt, but must fully and fairly exclude every reasonable hypothesis of their innocence.

Concerning reasonable doubt the court said: "A reasonable doubt is a substantial one, and not a captious or fanciful one. It is a doubt that must naturally and fairly arise from the evidence or lack of evidence, and not from any mere desire or inclination on your part to escape responsibility." Upon both these matters the charge is above criticism.

[15] The point is raised by counsel for plaintiffs in error that the proof of amounts of income and excess profits, and the taxes due thereon, did not measure up to the amounts stated in the indictment, and that the court's charge in this respect was erroneous. It was necessary only that it should appear that some amount was due, and that the returns were knowingly false and fraudulent in that respect.

[16] It appeared that there were errors in the books of the corporation, which had been corrected by accountants both for the corporation and for the government. These matters formed a considerable part of the testimony and were referred to frequently in the summaries. Defendants requested the court to charge that the defendants should not be held responsible for mere clerical errors and omissions on the part of employees. We think, in view of the confusion that might have existed in the minds of the jury, such an instruction should have been given.

[17] As has been stated, the question of whether the Texas business was entirely distinct from that of the corporation, or whether it was a mere selling agency of that corporation, was a critical question in the case. It is conceded that it took the form of a partnership composed of the two defendants. The court in its charge said:

"Now, gentlemen, it will be necessary for you to determine this controverted fact; that is, whether the Cooper Manufacturing Company was a copartnership composed of

William F. Cooper and Austin A. Cooper, or whether it was a mere trade-name and agency of the A. A. Cooper Wagon & Buggy Company. * * * If you determine that said Cooper Manufacturing Company was a copartnership, composed as stated, and that the profits derived and the losses sustained by said Cooper Manufacturing Company, in connection with and growing out of said Texas and Southwestern business transactions were profits and losses of the defendants as a copartnerhip, then, in considering and determining the facts whether the A. A. Cooper Wagon & Buggy Company had taxable income for the years 1918, 1919, and 1920, or any of said years, you will eliminate and disregard entirely all profits and losses of such Cooper Manufacturing Company."

It is undoubtedly true that the Cooper Manufacturing Company might have been a copartnership in a legal sense, and still an agency and adjunct of the Wagon & Buggy Company. At the close of the charge counsel for plaintiffs in error took exception in this language:

"There is a reference, I think, to the conditions under which the Cooper Manufacturing Company may be regarded, and its affairs in business taken into account, in determining the income or losses of the A. A. Cooper Wagon & Buggy Company, and I think in all those references your honor stated that contrasted the trade-name with a copartnership. I simply wanted to suggest that, in the event the Cooper Manufacturing Company was a sales agency, such as in the case of August Kriigel, in the operation of the business, that that would also authorize it to be drawn in, or its affairs and accounts to be drawn in, for the purpose of determining income and losses, even though it might be thought that there was an actual partnership existing."

"The Court: I will say to the jury that, in using the expression 'mere trade-name,' I mean to include the relation of agency also."

It is doubtful whether this brief remark sufficiently clarified this important distinction to the understanding of the jury.

[18] The corporation had a war contract with the government. At the conclusion of the Armistice in November, 1918, the government ordered a suspension of the work. While this did not terminate the contract, it was evident, and was so understood, that in fact that contract would no longer be executed in terms, and that it must become a subject of adjustment under claim for compensation. Just when the claim was filed is concededly uncertain. Counsel for defendant in error, by a system of comparison and exclusion, fixes the date as probably February 11, 1919. Certainly it had been filed and examined long enough, under the thorough and deliberate procedure of the government, to be paid April 16, 1919. The return of the Cooper corporation for 1918 was sworn to April 28, 1919, and was presumably in process and under consideration when this government award, amounting to $55,000, came in. This sum was entered upon the return for 1918. At that time the following regulation was in force:

"In view of the unusual conditions prevailing at the close of the year 1918 it is recognized that many items of gross income, such as claims for compensation under cancelled contracts, together with claims against contracting departments of the government, * * * while properly constituting gross income for the taxable year 1918 were undecided and not sufficiently definite in amount to be reported in the original return for that year. In every such case the taxpayer should attach to his returns a full statement of such pending claims and other matters, and when the correct amount of such items is ascertained an amended return for the taxable year 1918 should be filed."

This regulation might well, under the situation presented, in view of the chronology shown by the record, have raised a reasonable belief in the minds of plaintiffs in error that this amount should be entered, as it was, on the 1918 return. Counsel for the government argues that the statute unambiguously required a receipt to be returned as of the year when paid, or accrued, and that this claim both accrued as matter of law and was paid in 1919, and that a regulation to the contrary could not change or modify the statute. This may be sound argument as to the year for which the award should have been returned, and would be pertinent in a civil action; but it is by no means conclusive upon the belief and intent of these defendants. The court adopted the view of the government and charged as follows: "Now, gentlemen, if you find from the evidence that such were the facts, then the A. A. Cooper Wagon & Buggy Company, in making its income and excess profits tax return for the taxable year 1919, would be required to adjust any loss or gain on account of such transaction, as of the taxable year 1919."

Counsel for plaintiffs in error offered an instruction containing this language: "The court instructs the jury that any re-

turn filed while such regulation was thus in force could properly include any gains from such contracts in the year 1918, and exclude such gains from any other year, and any subsequent change in regulations would not have the effect of making such action, which was proper when done, illegal. Nor can there be imputed to defendants a wrongful or criminal intent, because a later regulation allocates to a later period the gains originally required to be attributed to the year 1918, and consequently results in taxable income for the subsequent period."

This instruction was refused, and the refusal was emphasized by the court's charge, which contained no advice to the jury upon the question of honest belief, good faith, and want of criminal intent in returning this sum for 1918, instead of 1919; and for this reason we believe that in spirit, and sufficiently in letter, error was committed, and that possible injustice resulted. This item was a very prominent one in the charge of fraud in the making of returns.

[19] Defendants' first request was the following: "The court instructs the jury that the indictment in this case is of itself a mere formal accusation or charge against the defendants, and is not of itself to be considered as evidence of the guilt of the defendants, and no juror should suffer himself to be influenced in the slightest degree by the fact that an indictment has been returned against the defendants." This instruction was refused, and the charge contained nothing to the same effect. The omission would not constitute reversible error in the absence of a request; but, when requested, such an instruction should be given.

[20] The witness Gorda T. Ball was permitted, over objection, to testify that in the fall of 1917, nearly two years prior to the conspiracies charged, the defendant A. A. Cooper asked him to change an inventory by cutting it in two. This admission was erroneous, because at that time no conspiracy existed.

[21] Error is assigned to the action of the court upon objection by the government in rejecting certain letters written by one A. T. Nolan covering a period from March, 1919, to December, 1920. Most of these letters were written in 1919, practically three years before the filing of this indict-

ment, and before the original adjustment of the accounts between the government and the Wagon & Buggy Company, in which the Texas business was recognized as a part of the business of the corporation. They bear upon their face internal evidence that they are in no sense self-serving. It will be remembered that the Wagon & Buggy Company, at the suggestion of one Merritt, who was in charge of the Texas business, had purchased lands in Texas for the better handling of the stock which had been taken in payment of wagons sold in that territory. The witness Nolan was placed in charge thereof by Merritt. The letters in question were addressed indiscriminately to "A. A. Cooper Wagon & Sleigh Company," "A. A. Cooper Wagon Company," and "A. A. Cooper Wagon & Buggy Company"; none of them were addressed to the Cooper Manufacturing Company. They concerned the proper operation and disposition of this land and stock. They tended to show the identity of the Cooper enterprises, under whatever name they were operated. In this view, they were, in our judgment, competent and material, and should have been admitted.

Many other errors are assigned, the specifications reaching a total of 131. We have considered only such as, in our judgment, condition the present disposition of this case. In so doing, it has been necessary to extend this opinion to an unfortunate length, in view of the fact that another trial cannot well be avoided. At that trial many of the things complained of will undoubtedly disappear. We reach the conclusion that the case must be reversed and a new trial granted. This is regretable, in view of the time and expense which has been and must be consumed and incurred. However, the case is of great importance in its bearing upon private reputations and public justice. Upon the record, the guilt of the defendants was an open question. In such case, slight departures in procedure may be determinative. While in a clear case we might hesitate to reverse upon many of the errors discussed, all taken together compel the feeling that justice to defendants and government alike requires a second test, in which the matters complained of may be largely, if not entirely, eliminated.