79 F.Supp. 12 (1948)
UNITED STATES
v.
ST. LOUIS DAIRY CO. et al.
Cr. 25713.
District Court, E. D. Missouri, Eastern Division.
July 19, 1948.
Drake Watson, U. S. Atty., of New London, Mo., George B. Haddock, Special Asst. to the Atty. Gen., and John R. Niesley, Walter D. Murphy and Joseph R. Cannon, Special Attys., Department of Justice, all of Washington, D. C., for plaintiff.
*13 Jacob M. Lashly, of St. Louis, Mo., for defendants St. Louis Dairy Company and Basil M. Lide.
James A. Finch, of Cape Girardeau, Mo., and E. C. Hartman and William H. Allen, both of St. Louis, Mo., for defendants Pevely Dairy Company, Arthur Kerckhoff, Richard D. Kerckhoff, Elmer M. Kerckhoff, Daniel M. Kerckhoff and Alexander Kerckhoff.
HULEN, District Judge.
The two corporate defendants and certain of their officers by indictment were charged with conspiracy to fix uniform and non-competitive retail and wholesale prices for fluid milk sold by the corporate defendants in the St. Louis area, under Section 1, Title 15 U.S.C.A., commonly known as the Sherman Anti-Trust Act. Trial by jury resulted in acquittal of all individual defendants. The corporate defendants were found guilty. Defendants assert:
(1) There is no substantial evidence to support the verdict.
(2) The guilt of the corporations could have been established only through the defendant officers and the officers having been acquitted the conviction of their principals cannot stand.
(3) The government proved two separate conspiracies, if any, and therefore the record cannot support a single continuing conspiracy as charged.
The indictment charged that  during a period of ten years immediately preceding its return the defendants continuously engaged in an unlawful conspiracy to fix uniform and non-competitive retail and wholesale prices for fluid milk sold and distributed by the defendants in the St. Louis area; the conspiracy consisted of a continuing agreement and concert of action among the defendants that the defendants would charge uniform and non-competitive retail and wholesale prices for fluid milk sold by them, and neither corporate defendant would make any change in price until an agreement had been reached between them that the other would make an identical change. Changes in price during 1946, 1947 and 1948 are specifically mentioned in the indictment.
There is little dispute in the testimony. The Government would draw an inference of guilt and the defendants an inference of innocence from the record. The Government's evidence in substance was that in 1938 the defendant dairies "were losing money"  their "sales were deteriorating rapidly"  when a Mr. Gee, sales manager for defendant St. Louis Dairy Company, and Mr. Wasser, sales promotion agent for defendant Pevely Dairy Company, commenced a regular course of conduct of conferring with each other on the subject of change by them in the retail price of milk, wholesale and retail, in the St. Louis area. These conferences, at intermittent times, continued to 1941. The parties last named testified that when either of their principals had decided on a price change he (Wasser or Gee) would meet with the representative of the other defendant dairy to notify him of "proposed price changes". In "every instance" where this was done the corporate defendant to whom the information was conveyed "increased its price exactly the same amount." The corporate defendants changed, by increase, their price on retail and wholesale milk in exactly the same amount, even to a fraction of a cent, simultaneously on April 8, 1938, August 7, 1939, February 9, 1940, December 1, 1940, and July 1, 1941. The defendants decreased their price in exactly the same amount, retail and wholesale, simultaneously on June 12, 1939. Defendant Pevely Diary increased its price on retail and wholesale sales one cent on September 1, 1941, and defendant St. Louis Diary made the same change on the following day. The record does not show prices or dates on which prices were changed of either defendant prior to April 8, 1938. During the period defendants operated under the Emergency Price Control Act there were some changes by defendants in the price of milk from January 19, 1943 to June 19, 1946. The jury was instructed to disregard these price changes. During the year 1946 there were three price changes by the two corporate defendants. They follow a different pattern from the price changes prior to the period of the Emergency Price Control Act. On July 3, 1946 defendant Pevely Dairy increased its price one cent. Defendant *14 St. Louis Dairy followed with a like increase on the next day. On July 9, 1946 St. Louis Dairy raised its price a cent and a half and Pevely Dairy followed with a like increase the next day. On October 4, 1946 defendant Pevely Diary raised its price two cents and defendant St. Louis Diary followed with the same increase the next day. For the year 1947 the price change pattern reverts to that of the time prior to "O.P.A." The two defendants made a reduction in retail and wholesale price of milk in exactly the same amount, to a fraction of a cent, simultaneously on January 20, 1947. The two defendants made an increase of exactly the same amount, to a fraction of a cent, simultaneously on August 1, 1947. The two defendants made an increase of exactly the same amount, to a fraction of a cent, simultaneously on September 16, 1947. Commencing on January 27, 1948 Pevely Diary increased its price to 22½ cents on retail and 20½ cents on wholesale price of milk and on the following day defendant St. Louis Dairy made the same increase.
Witness Gee was asked the following question:
"On every time, every occasion that either of these dairies, Pevely or St. Louis, has increased the price, the other dairy has immediately put into effect a corresponding increase in price, hasn't it?
His answer was:
"Yes, but that is confined to our two dairies."
The two defendants set the price of milk in the St. Louis area and when the defendants raised their price "the other companies raised almost immediately or within several days usually * * *".
The witness Wasser was asked why he communicated the proposed price changes to the sales manager of the defendant St. Louis Dairy. His answer was:
"Because I knew it was impossible for us to sell at a higher price than our competitor, and I wanted to tell him what our price was, what the increase was, hoping that their company would increase their price, too."
"Q. And your hope was never disappointed, was it? A. I don't think so.
"Q. As a matter of fact, you wanted a stable market, didn't you? A. We all want that.
"Q. In fact, you wanted to avoid any competition in price, didn't you? A. Well, it was impossible for us to get a higher price than our competitor."
Neither Wasser nor Gee testified to a specific agreement with the agent of the other corporate defendant for a price change. Gee testified he never agreed with Mr. Wasser to a price change. Mr. Wasser testified that Mr. Gee never assured him that his principal would go along with the price change. The corporate defendants sell and distribute over sixty per cent of the fluid milk consumed in the St. Louis area.
St. Louis Dairy Company, on page 3 of its brief, states its position on the Government's case as follows:
"The foregoing facts upon which the government rests exclusively, by themselves, would support two logically permissible inferences: one of conspiracy and one of normal, law-abiding, business-like conduct on the part of defendants. Either inference perhaps would have been legally permissible, had the evidence in the case been limited to those facts."
The evidence of the defendants consisted of a mass of company records and exhibits together with testimony of a number of witnesses to the effect that the basic costs which must be met in fixing the price of milk are uniform as to both defendants and that price increases offered as a part of the Government's case were dictated and forced by economic considerations over which the defendants had no control. A Federal milk order fixes the minimum price handlers such as defendants must pay in the St. Louis division. See Bailey Farm Dairy Co. vs. Marvin Jones et al., 8 Cir., 1946, 157 F.2d 87. Generally the defendants in the St. Louis division pay the minimum. Some milk purchased by the defendants in the Chicago division is at a higher price. Labor contracts of the defendants are uniform for the employees covered by them. Each of the defendants allocates to the milk division a certain proportion of the administrative expense and overhead; in *15 turn a certain proportion of this overhead and administrative expense is allocated to fluid milk and in turn used in determining the cost of fluid milk and whether there is a profit or loss in the sales of fluid milk. Both defendants objected to the Government inquiring into its general overhead and administrative expense and sought to confine the Government's inquiry to the overhead and administrative expense allocated to fluid milk. Defendant Lide took the stand. The other individual defendants did not.
Defendants argue, "The inferences which the government relies upon are conclusively rebutted by the whole evidence in this case". Did the evidence of the defendant, together with the evidence of the Government, conclusively as a matter of law answer the Government's case and entitle defendants to a directed verdict?
I. Argument at hearing and brief offered in support of the pending motion are presented on the premise the Government's case consisted of circumstantial evidence and the jury's verdict resulted from basing inference upon inference. The trial and verdict do not leave us with that impression. That conspiracy cases are difficult to prove of course does not relieve the Government of responsibility of meeting the requirement that guilt of accused must be proven beyond a reasonable doubt, but the character of the offense is such it is seldom susceptible of proof by direct evidence. In Cooper v. United States, 9 F.2d 216, loc. cit. 224, the Eighth Circuit Court of Appeals said:
"It is practically always established by circumstantial evidence, and this method in no sense amounts to the building of one presumption upon another." (Emphasis added.)
We cannot escape the impression defendants would now have the judge substitute his conclusions on the evidence for those of the jury. That is not the province of the judge. The jury having found the defendants guilty we understand that our duty on the pending motion is to view the evidence and inferences reasonably to be drawn therefrom which are most favorable to the Government and determine if there is substantial evidence to support the verdict. A different jury might have drawn different inferences from the testimony. With the trial of this case in its present stage the reasonableness and plausibility of explanations offered by the defendants, the weight to be given to their evidence, the credibility of the various witnesses, and whether their testimony shall be believed, in whole or in part, is not our duty. That is for the jury. Cravens v. United States, 8 Cir., 62 F.2d 261, loc. cit. 274. In this case we have the conceded fact representatives  those in charge of sales  of the two defendants conferred over a period of years on the subject of price of Grade A milk and price changes to be made by them, before they were made. We have the uncontradicted testimony  confirming a fundamental law of economics  that one of the defendants could not sell at a higher price than the other without losing business as a pure matter of competition. This situation furnished a prime motive for the two defendants to seek concert of action in price changes and prices charged. Witness Wasser testified, "It was impossible for us to get a higher price than our competitors". With this situation before them sales representatives of the two defendants conferred, with the result, "in every instance", increases in price were exactly the same with the two defendants and, with rare exceptions, on exactly the same date. It was said in Smith vs. United States, 8 Cir., 1907, 157 F. 721, loc. cit. 728:
"The effects and results of a conspiracy can be observed and proved, but rarely can one get a glimpse or make proof of the secret conferences which inaugurate it. For these manifest reasons proof of a criminal combination to do an unlawful act can rarely be made except by light reflected from its consequences or results."
One of the defendants argues the Government case can receive no aid from the testimony of Wasser and Gee. This defendant argues that since the witness Gee testified that he never "agreed" with Wasser to a price change and the witness Wasser testified he never was "assured" St. Louis Dairy would go along with the price change, the Government is bound by *16 such testimony. This defendant states its position thus:
"* * * the Government, having called Gee and Wasser as witnesses and having adduced from them positive testimony that they made no sort of conspiratorial agreement, cannot sustain its case upon the theory that the jury could reject the last mentioned testimony of these witnesses and infer the existence of a fact directly contrary thereto."
First let it be determined if the Government is required to offer proof of a formal agreement between the defendant corporations to fix prices as charged in the indictment. In American Tobacco Co. v. United States, 6 Cir., 147 F.2d 93, loc.cit. 107, the law is stated as follows:
"No formal agreement is necessary to constitute an unlawful conspiracy. Almost always, the crime is a matter of inference, deduced from the acts of the persons accused, which are done in pursuance of an apparent criminal purpose. Stack et al. v. United States, 9 Cir., 27 F.2d 16; Pearlman v. United States, 9 Cir., 20 F.2d 113. The agreement may be shown by a concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose. Marino v. United States, 9 Cir., 91 F.2d 691, 113 A.L.R. 975. It is the common design which is the essence of the conspiracy or combination; and this may be made to appear when the parties steadily pursue the same object, whether acting separately or together, by common or different means, but always leading to the same unlawful result. United States v. Harrison, 3 Cir., 121 F.2d 930; Allen v. United States, 7 Cir., 4 F.2d 688. Often, if not generally, direct proof of a criminal conspiracy is not available, and the common purpose and plan are disclosed only by a development and collocation of circumstances. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; United States v. Manton, 2 Cir., 107 F.2d 834; and it is settled that the essential agreement, combination, and conspiracy in violation of the Sherman Act may be implied from, or found in a course of dealing or other circumstances, as well as through an exchange of words. United States v. A. Schrader's Son, Inc., 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471; United States v. Pullman Co., supra, 50 F.Supp. 123, at page 134."
The Supreme Court in Interstate Circuit, Inc. v. United States, 306 U.S. 208, loc.cit. 227, 59 S.Ct. 467, 474, 83 L.Ed. 610, ruled the question:
"It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators. United States v. Schenck, D.C., 253 F. 212, 213, affirmed, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470; Levey v. United States, 9 Cir., 92 F.2d 688, 691. Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act. Eastern States Lumber Association v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788, Lawlor v. Loewe, 235 U.S. 522, 534, 35 S.Ct. 170, 171, 59 L.Ed. 341; American Column Co. v. United States, 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284, 21 A.L.R. 1093; United States v. American Linseed Oil Co., 262 U.S. 371, 43 S.Ct. 607, 67 L.Ed. 1035."
Speaking for the Eighth Circuit, Judge Gardner, in Galatas v. United States, 80 F.2d 15, loc.cit. 22, announced the law as follows:
"The agreement need not be in any particular form, but it is sufficient that the minds of the parties met understandingly. A mutual implied understanding is sufficient so far as the combination or confederacy is concerned; and, in fact, the agreement is generally a matter of inference, deduced from the acts of the persons accused, which are done in pursuance of an apparent criminal purpose. It is not necessary to prove that the defendants actually agreed in terms to adopt the unlawful purpose and to pursue it by common means. A conspiracy is rarely susceptible of proof by direct evidence, but must be proved by circumstantial evidence. It may be deduced from the conduct of the parties and the attending circumstances."
*17 From these authorities we conclude that where the circumstances are such as to warrant the jury in finding that the conspirators had some unity of purpose, or some common design and undertaking, or some meeting of the minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified. See Marx v. United States, 8 Cir., 1936, 86 F.2d 245, loc.cit. 250. See also Shannabarger v. United States, 8 Cir., 99 F.2d 957.
As we view the record the finding of the jury is not in conflict with the testimony of the witnesses Gee and Wasser, if the testimony isolated by defendants has probative value. It has elements of conclusions and opinions of the witnesses. Neither of the witnesses testified or was asked to testify what was said at the conferences between them. The jury was left to draw inferences as to what was said and done on the occasion of the conferences from the admitted reason for calling the conferences, and as well what the parties hoped to accomplish and to avoid. Wasser testified as to why the conferences were called, "Because I knew it was impossible for us to sell at a higher price than our competitor, and I wanted to tell him what our price was, what the increase was, hoping that their company would increase their price, too." This witness testified that he wanted a stable market and that his company could not get higher prices than its competitor. Certainly from this explanation of the reason for calling the meeting the deduction could be made by the jury that it was to arrive at uniformity of action on prices, in view of what invariably took place thereafter. The witness said he went into the conference "hoping that their company would increase their price" and that he hoped to accomplish a stable market and to avoid competition in price. When this evidence is considered in the light of each defendant's repeated assertion through the trial that if it raised its price without the other defendant doing likewise it would lose business, and that each conference was followed by a simultaneous raise in price by the defendants to the exact fraction of a cent, we think a fair and reasonable inference from the testimony was that the parties acted in concert by virtue of a mutual understanding to fix prices on milk.
One would be naive indeed to conclude, as defendants urge, that when a representative of one of the defendants initiated a conference with the other to discuss prices, under such circumstances as we set out, that the agent initiating the conference did so solely to tell his competitor's agent "We are going to raise our price on Grade A milk one and one-half cents commencing thirty-six hours hence. Goodbye." Such a message could have been transmitted by telephone, by telegram, by an errand boy. But here the sales representatives of the two corporate defendants had to meet personally  one of the meetings was held in a public park. The meetings were prearranged.
In Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 953, 58 L.Ed. 1490, L.R.A. 1915A, 788, the Court had before it certain reports circulated by lumber dealers listing the names of wholesalers who make sales direct to consumers. Nothing was said in the reports regarding trading with the wholesalers by the retailers among whom they were circulated, but the Court said:
"True it is that there is no agreement among the retailers to refrain from dealing with listed wholesalers, nor is there any penalty annexed for the failure so to do; but he is blind indeed who does not see the purpose in the predetermined and periodical circulation of this report * * *".
Like terms could be applied to the conferences between the agents of the two corporate defendants to discuss the retail price of milk. The conferences continued until the defendants received information of a grand jury investigation. A federal grand jury was investigating their conduct. There is no direct evidence of similar conferences thereafter. It would be strange if there was any. After "O.P.A." control was lifted we find the same pattern followed by the defendants as to uniformity of prices and dates of changes of prices that was the practice during the period when there is direct evidence of conferences between the agents of the two corporate defendants.
*18 Of all the dairies in St. Louis only the two defendants could fathom with such minute exactitude as to date and amount when and in what amount the two defendants would make a price change. During the period when conferences were being held they synchronize precisely. During 1946 one day separates the price changes made by the defendants, with the defendants alternating in taking the initiative on price change. This practice ended with the year 1946. In 1947 the practice is again that of the period when representatives of each of the defendants were holding conferences on the subject. We think the comment of the Court in Davis v. United States, 6 Cir., 107 F. 753, loc. cit. 755, is applicable:
"The evidence shows a detail of facts and circumstances in which the alleged conspirators are involved, separately or collectively, and which are clearly referable to a preconcert of the actors, and there is a moral probability that they would not have occurred as they did without such preconcert, that is sufficient if it satisfies the jury of the conspiracy beyond a reasonable doubt."
Defendants present the proposition that the Government's circumstantial evidence case was "conclusively" rebutted as a matter of law by defendants' evidence as to the cost of doing business and declaration that prices and price changes for Grade A milk were forced by economic reasons. The jury could have believed the testimony offered by defendants as to the cost to defendants of putting fluid milk on the market, that they had substantially the same expenses in the cost of milk and labor charges and that economic factors did call for the various changes in price of milk shown by the evidence, and still have found the defendants guilty of conspiracy to fix prices as charged in the indictment. They are not inconsistent findings. If defendants did jointly fix prices by unlawful action, the fact (if it be a BADTEXT) that the prices as so fixed were reasonable and dictated by economic factors could not excuse such conduct. Any such concert of action between the two corporate defendants to fix prices for fluid milk in the St. Louis area under the circumstances of this case is banned by the Sherman Act, 15 U.S.C.A. §§ 1-7, 15 note. Concededly the defendants control milk prices in the St. Louis area. They control by selling a major portion of fluid milk consumed. They possess the power to make their control effective. Under these circumstances the danger of severe consequences of agreements to fix prices, by destroying price competition, was one of the results which the Sherman Act was intended to prevent. Such agreements are proscribed by the Act and cannot be excused by collateral consideration, such as reasonableness of the prices, if urged in justification of the practice. United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989.
Defendants' evidence was offered to support their position that cost of putting fluid milk in the hands of the consumer necessitated their raising prices at the same time to avoid loss of business. If the price changes and prices charged by the defendants were solely the result of these factors and not unlawful combine between the defendants, such is a good defense. If the price changes and uniformity in prices resulted from both factors the jury was authorized to render a verdict of guilty.
Defendant St. Louis Dairy presents the proposition  the record conclusively shows that only its President, Mr. Lide, had authority to determine and fix prices, there is no evidence that Mr. Lide engaged in the conspiracy charged, the defendant corporation can only be liable for acts done by its agents acting in the scope of their authority, and regardless of what others may have done their acts are not binding on the corporation. Whether this argument would confine the issue too narrowly we do not feel called on to determine. Mr. Gee testified that he always took part in the meetings "when determinations are being made" as to change in prices of fluid milk by the St. Louis Dairy, that he "advised" with Mr. Lide "in regard to the necessity of a price change, and that he with two others was responsible for operating the business during Mr. Lide's absence". True this witness testified  "The final decision rests with Mr. Lide" of prices to be charged by the St. Louis Dairy Company, *19 but he testified that in every instance where he had a consultation with the representative of Pevely Dairy Company on the subject of proposed price changes a price change was made by both corporate defendants in exactly the same amount, on exactly the same date, except in the instances we have noted.
As we understand the law for the purpose of determining legal liability and responsibility a corporation has an existence separate and apart from that of the persons constituting its officers and agents and it may be guilty of violations of law apart and separate from the guilt or innocence of its officers. In this case the jury were informed in substance that in determining the guilt or innocence of the corporate defendants they should look to the acts done and declarations made by the corporate officers, agents and employees, and that a corporation is bound by and legally responsible in a criminal case for acts performed or things done by an officer, agent or employee of the corporation when such officer, agent or employee is acting within the scope of his authority and the acts of such officer, agent or employee are performed for the corporation employing him and are the duties delegated to him. See New York Cent. & H. R. R. Co. v. United States, 212 U.S. 481, 29 S.Ct. 304, 53 L.Ed. 613; and Egan v. United States, 8 Cir., 137 F.2d 369, loc. cit. 379. The guilt or innocence of the corporate defendants was a jury issue of fact.
II. Defendant St. Louis Dairy points to the "acquittal of the agent who committed the alleged wrongful action in issue (and urges that it) operates ipso facto as a discharge of the principal, whose liability could be established only through that particular agent by virtue of the principle respondeat superior". Argument under this heading is presented on the theory that acquittal of defendant Lide and the five Kerckhoffs establishes innocence of the corporate defendants since the individual defendants were the only ones authorized to fix the price of milk. We call attention to our comments under the last heading without reiteration as applicable to defendant's claim now being considered. What was there said may have served as the basis, in view of the instruction on reasonable doubt, for the jury to acquit defendant Lide. As to the five Kerckhoff defendants, they were not in charge of the business of Pevely Dairy Company during the time conferences were being held by representatives of the two corporate defendants. As to their participation in the business of Pevely Dairy Company subsequent thereto they were identified in the evidence as a group constituting a board. There was no evidence that each of the five Kerckhoff defendants was ever present at any one board meeting. Again, the jury, operating under instruction on reasonable doubt and presumption of innocence, may have voted their acquittal because of the circumstances referred to. Able counsel representing the individual defendants, as well as the corporate defendants, made eloquent and forceful appeals to the jury and, among other things, admonished the jury that a conviction of the individual defendants would be a stain on their records and reputations. The arguments may have been persuasive. If the jury, yielding to this line of argument, acquitted the individual defendants, their action cannot serve also as an acquittal of the corporate defendants whom they convicted. The law appears to be plain. See United States v. General Motors Corporation, 7 Cir., 121 F.2d 376, certiorari denied 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497, and American Medical Ass'n v. United States, 76 U.S.App.D.C. 70, 130 F.2d 233, affirmed 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434. We quote from the opinion in the General Motors case [121 F.2d 411]:
"The question on review should not be whether the verdict against the corporations is consistent with the acquittal of the individuals. Rather it should be whether the conviction is consistent with the evidence. In other words, we believe that the acquittal of the officers and agents, even if they had been the only persons through whom the corporations could have acted, should not operate without more to set aside the verdict against the corporations. Nor do we attach significance to the argument that the problem of inconsistent verdict in the instant case presents a different problem than that when the verdicts upon two counts are inconsistent. See Dunn v. United *20 States, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356, 80 A.L.R. 161; United States v. Meltzer, 7 Cir., 100 F.2d 739, 741. In fact we believe that the same rule is applicable, that consistency in a verdict is not required, and that the language in the Austin-Bagley case supra [2 Cir., 31 F.2d 229] tends in that very direction." (Emphasis added.)
Defendant St. Louis Dairy Company cites in its brief, in support of its position under this heading, a large number of civil cases. Regardless of what the rule may be in the various jurisdictions in civil cases they are not applicable in this case. For that reason we do not discuss them.
III. Finally, defendant St. Louis Dairy Company urges that the evidence showed two separate conspiracies, if any, therefore the record cannot support the charge of a single conspiracy as set forth in the indictment.
The charge contained in the indictment is a continuing conspiracy commencing in 1938 to return of the indictment. The record would support a finding the conspiracy ended with the alleged cessation of conferences between the two defendant dairies in 1941 although the case was not submitted on that theory directly. During the period when Office of Price Administration regulations governing prices were in effect the statute of limitations did not run on violations of the Sherman Anti-Trust Act. See Act of Oct. 10, 1942, c. 589, 56 Stat. 781. On the point of one continuing conspiracy there was substantial evidence on which to base the verdict, in our opinion, in the pattern of prices charged up until the return of the indictment that defendants took up their unlawful concert of action following ending of "O. P. A." where "O. P. A." left it, when price control became effective. The price changes during the "O. P. A." were withdrawn from the jury as not constituting any evidence in support of the charge. This action by the judge in and of itself did not sever the conspiracy. We see no merit in defendant's contention in this respect.
Whether or not the case should have been submitted to the jury is not to be determined by dismembering the evidence and viewing it in parts, but the evidence must be considered as a whole. United States v. Patten, 226 U.S. 525, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.,N.S., 325. The evidence offered by the defendants as to cost of doing business consisted principally of defendants' company records, exhibits made from company records, and opinions based upon or reflected by records. Such records are not documentary evidence carrying assurance of verity. It was the exclusive province of the jury to determine the weight to be given this evidence. Also the weight to be given testimony that prices and changes in prices of milk made by the defendants was due solely to economic reasons operating on each defendant independently and not resulting from concert of action between them, was for the jury. It is our opinion the evidence in this case is not as consistent with the innocence of the defendants as with their guilt. Taking the record as a whole we conclude the jury was justified, under the instructions, in finding that the facts evidencing conspiracy were consistent with the guilt of defendants and inconsistent with their innocence.

Order
Motion of Pevely Dairy Company for Judgment of acquittal and in the alternative for a new trial is overruled, and motion of Pevely Dairy Company for a judgment in arrest of the judgment is overruled, and motion of defendant St. Louis Dairy Company for judgment of acquittal and in the alternative for a new trial is overruled.