JOHN GRIFFITHS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 18162.   Promulgated February 7, 1929.

*P. Tinkoff*, *Esq.*, for the petitioner.
*James A. O'Callaghan*, *Esq.*, for the respondent.

**OPINION.**

TRAMMELL: The first question is whether the petitioner is taxable in 1919 on all the bond premiums to which he was entitled, or whether a portion of the amount should be taxable in previous years.

George W. Griffiths testified that the matter of permitting the directors to sign bonds for the company and to receive the premiums ordinarily allowed surety companies for such services first arose in 1916 and that a meeting was called at which such an agreement was reached. He also testified that even in years prior to 1916 the directors probably signed such bonds. He testified as follows: " Now before 1916 did the members of this corporation sign surety bonds for the corporation? " A. " I imagine they did. I can not say. I really do not remember that. I imagine they did."

The contention is made that the contract was made in 1916 by which the directors were to receive these premiums for signing bonds and that, since Griffiths was in control of the corporation and could at any time have withdrawn any assets due him, the amounts were constructively received by him in the years when the bonds were signed.

The testimony in this case is so conflicting and repugnant to facts shown by the records of the corporation that we are not convinced by a preponderance of the evidence in the first place that the agreement was actually made in 1916 as alleged or that it was made at any time prior to 1919.

Aside from the testimony of Griffiths, we have the testimony of Ruettinger and Joyer. Griffiths does not specifically state that the agreement was made in 1916, but only that the question arose in that year and that a meeting of the directors was called. Whether it was called in 1916 the witness did not state. The fact that bonds were signed in 1916 is not convincing as to the date when it was agreed that the directors should receive premiums therefor. From the testimony it appears that even prior to 1916 these bonds had sometimes been signed in the same way. Ruettinger's testimony in a way corroborated Griffiths, but his testimony is in conflict with the facts established by documentary evidence submitted by the petitioner. Reuttinger testified that he signed bonds when the evidence showed that bonds were waived and no bonds were signed by any one. Reuttinger, according to documentary evidence, signed only three bonds, while he testified that he signed from six to ten. Joyer's testimony is so conflicting and uncertain that we can give little or no weight to it.

The amount of $87,926.63 on account of these bond premiums was credited to the petitioner's dividend account in 1919 and includes his pro rata share according to his stockholdings of premiums on bonds in connection with the contracts of the Chicago Union Station Co.—the Butler Building-Caissons, the Chicago Telephone Building, and the Morrison Hotel, when in none of those contracts were there any sureties on bonds. In the latter two contracts bonds were waived and none were given, yet book entries were made crediting to the accounts of the petitioner and other directors bond premiums for bonds as if bonds had been signed. In connection with the first two contracts above mentioned, credits were made to the petitioner for premiums when he signed no bonds.

While there was testimony to the effect that the entries crediting the bond premiums to dividend account were erroneous, there is some evidence which would warrant such action, but there is no contention here made that the amounts were dividends in so far as the petitioner is concerned. That question was not made an issue in the case and no testimony was directed to such question.

The respondent determined that the amounts of the bond premiums which were credited to the petitioner in 1919 were constructively received by him in that year, while the petitioner contends that a portion was constructively received in previous years.

There is a presumption that the determination of the Commissioner is correct until it is overcome by the preponderance of the testimony. There is uncontradicted testimony to the effect that the amounts were credited to the petitioner on the books of the corporation in 1919, that the amounts were not ascertained or determined

until that year. The corporation claimed no deduction on account of such amounts until 1919 and we are not convinced that prior to 1919 there was any definite agreement with respect thereto. There is no evidence which convinces us that any memorandum or any record was made until that year of any agreement. Reuttinger held only one qualifying share of stock and was, if the contract had been made in 1916, entitled to share in the bond premiums signed by him to the extent of 18 per cent, in accordance with his interest in the profits according to his contract of employment, yet he received nothing nor were any amounts credited to him until 1919, in so far as these premiums were concerned. Joyer testified that in 1919 he was first given a memorandum with respect to the book entries to be made by him, while the following day he was recalled to the stand after a conference with counsel for the petitioner and changed his testimony. On the previous day he had repeatedly stated that this occurred in 1919, and when asked by the Board member if he was confused about the matter, stated that he was not.

Considering all the testimony, we are not convinced that the determination of the respondent was erroneous.

At the hearing the respondent asserted the fraud penalty for wilfully filing a false or fraudulent return. There was no contention on the part of the petitioner that the return should not in any event have included a portion of the bond premiums credited to the petitioner's account in 1919. The contention was that only a portion of the entire amount should have been included in previous returns, but the petitioner did not report any part of the amount in his returns for any of the years 1916, 1917, 1918, or 1919, nor was any disclosure of the facts made in any of the returns. Even if the petitioner's contentions had been sustained in every respect, still, according to the petitioner's own testimony, a considerable portion of income admittedly taxable was omitted from his return. According to the petitioner's own theory and contention as supported by one exhibit, the amount of $38,126.73 out of the total of $87,926.63 was properly taxable in 1919. According to the dates of contracts in another exhibit, an amount in excess of $50,000 was properly taxable to petitioner under his own theory in 1919. The explanation offered as to why no amount whatever of bond premiums was included in the return is the fact that the bookkeeper for the corporation made out the return and submitted it for approval to an attorney and that the petitioner merely signed it; that the petitioner filing his return on a cash receipts and disbursements basis and the amounts not having been received in cash, the return should not be held to be fraudulent on account of the omission of such amount. We have heretofore held that a taxpayer can not avoid his responsibility by having his return prepared by another.

260

The taxpayer is responsible for his return under oath regardless of whether he personally makes it.

There is no testimony, however, to the effect that the petitioner did not consider the amounts taxable because they were not received in cash.

On the other hand, the theory of the petitioner's case is that the amounts were taxable before received in cash and it is not contended that he should have waited until he withdrew the cash before reporting them in his income. Under the evidence he clearly could have received the entire amount in cash in 1919 if he had desired. All that he had to do was to take it.

Considering all the evidence, it is our opinion that the petitioner's return for 1919 was wilfully false and fraudulent and made with the intent to evade the tax.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

MURDOCK, dissenting: I dissent from that portion of the foregoing opinion which holds that the fraud penalty should be asserted, for the reason that I think the facts indicate no more than negligence.

SMITH, TRUSSELL, VAN FOSSAN, and SIEFKIN agree with this dissent.