James F. Burnett, Jr. and Margaret Burnett v. Commissioner. J. F. Burnett, Jr., Inc. v. Commissioner.Burnett v. CommissionerDocket Nos. 91655, 91656.United States Tax CourtT.C. Memo 1964-314; 1964 Tax Ct. Memo LEXIS 24; 23 T.C.M. (CCH) 1917; T.C.M. (RIA) 64314; December 4, 1964*24 The individual petitioner, (Docket No. 91655), who was president and sole stockholder of the corporate petitioner (Docket No. 91656) during each of the taxable calendar years 1955, 1956, and 1957, used corporate funds for his personal use and concealed such diversions on corporate books and records as business expenses of the corporation. Receipts representing sales of the corporate petitioner were applied in part to corporate sales and the balance was credited to petitioner's loan account on the corporation's books. Some sales receipts payable to the corporate petitioner were not recorded on the corporation's books either as sales or a credit to petitioner's loan account, but were taken by petitioner for his personal use. As a result of petitioner's diversion of corporate funds and his causing of false entries to be made on the corporate books and records, the corporation failed to record on its books and to report on its income tax returns for the fiscal years ended April 30, 1956, 1957, and 1958, income from sales in the amounts of $4,500, $29,604.95, and $40,612.84, respectively. The individual petitioners and corporate petitioner do not contest the deficiencies in tax for the*25 taxable years involved herein as determined by respondent and modified by the stipulation of the parties. However, they challenge the imposition of additions to tax for fraud for the period in question. 1. Held: At least a part of the underpayment of tax of the individual petitioners and corporate petitioner for each of the taxable years involved was due to fraud with the intent to evade tax; and the additions to tax provided in sec. 6653(b) of the 1954 Code are to be applied. 2. Held: The statute of limitations is not a bar to the assessment and collection of taxes against the individual petitioners for the calendar years 1955 and 1956 and against the corporate petitioner for the fiscal years ended April 30, 1956, and April 30, 1957, under sec. 6501(c)(1) of the 1954 Code. Matthew V. Byrne, Jr., 412 Syracuse-Kemper Bldg., Syracuse, N. Y., for the petitioners. Edward H. Hance, for the respondent. FISHER*26 Memorandum Findings of Fact and Opinion FISHER, Judge: This consolidated proceeding involves deficiencies in income tax and additions to tax determined against petitioners as follows: Docket1 Addition to Tax PetitionerNumberYearDeficiencySec. 6653(b)James F. Burnett, Jr., and Margaret Burnett916551955$ 3,252.59$ 1,626.30195624,466.9112,543.68195763,035.3431,517.67F/Y/EJ. F. Burnett, Jr., Inc.916564-30-56$16,236.41$ 8,118.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,966.1619,483.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,914.7711,957.39*27 Petitioners in Docket No. 91655 do not contest the adjustments to taxable income set forth in the notice of deficiency for the years 1955, 1956 and 1957, as modified by the deletion from taxable income of amounts which have been stipulated by the parties as follows: YearAmount1955$ 73.5719561,280.7019571,518.78Petitioner in Docket No. 91656 does not contest the adjustments to taxable income set forth in the notice of deficiency for the fiscal years ended April 30, 1956, 1957 and 1958, as modified by the allowance of deductions which have been stipulated by the parties as follows: Fiscal Year EndedAmountApril 30, 1956$ 121.32April 30, 19571,164.49April 30, 19581,718.48The principal issues presented for ourconsideration are: (1) Whether any part of any underpayment determined for each of the taxable calendar years 1955, 1956 and 1957 with respect to the individual petitioners in Docket No. 91655 was due to fraud with intent to evade tax; (2) whether any part of any underpayment determined for each of the*28 fiscal years ended April 30, 1956, 1957 and 1958 with respect to the corporate petitioner in Docket No. 91656, was due to fraud with intent to evade tax; (3) whether assessment and collection of any of the deficiencies against the individual petitioners for the years 1955 and 1956 are barred by the statute of limitations; and (4) whether assessment and collection of the deficiencies against the corporate petitioner for the fiscal years ended April 30, 1956, and April 30, 1957, are barred by the statute of limitations. General Findings of Fact The facts are partly stipulated and to the extent so stipulated are incorporated herein by reference. James F. Burnett, Jr. and Margaret Burnett, the individual petitioners in Docket No. 91655, reside at 29 Kurrwood Circle, Rochester, New York. James F. Burnett, Jr., and Margaret Burnett filed joint income tax returns for the calendar years 1955, 1956 and 1957 with the district director of internal revenue, Buffalo, New York. James F. Burnett, Jr., will sometimes hereinafter be referred to as the petitioner. J. F. Burnett, Jr., Inc., the petitioner in Docket No. 91656 filed corporation income tax returns for the fiscal years ended April 30, 1956, 1957, *29 and 1958, with the district director of internal revenue, Buffalo, New York. J. F. Burnett, Jr., Inc., will hereinafter sometimes be referred to as the corporate petitioner. James F. Burnett, Jr., entered the filter business in 1949 with two employees operating from his own home and a barn in the neighborhood. In the beginning the corporate petitioner dealt with so-called "throwaway type" filters and its only activity was the sale of these filters. During the taxable period involved herein, the corporate petitioner was a fabricator and distributor of air filters and fiberglas insulation materials. The corporate petitioner did business in western and central New York with its headquarters located in a renovated theater building in Rochester, New York. After a number of years the corporation obtained substantial business with Carrier Corporation in Syracuse, New York, and from then on the corporate petitioner's business grew rapidly. Petitioner was president, treasurer and sole stockholder of the corporate petitioner during the taxable years involved herein. Petitioner was also a salesman for the corporate petitioner during the years in question and has been so engaged throughout*30 his working life. The financial success of the corporate petitioner was largely attributable to the sales efforts of petitioner. During the taxable years involved petitioner was occupied with sales on behalf of the corporate petitioner, making calls on customers and suppliers which restricted to a great extent his presence in the office of the corporate petitioner. Petitioner entrusted the bookkeeping of his business to David Kass, his accountant, and to Carmella Decker, his office manager and bookkeeper. Kass had been associated with Burnett since the early 1930's when both were employed by Rochester Gas and Electric Company. Kass was chief accountant for Rochester Gas and Electric Company. He had been employed by said company for about 37 years at the time of the instant trial. Since 1927, Kass has also engaged in public accounting. Kass took care of all of petitioner's accounting and for many years prepared all of his income tax returns, including those involved herein. Kass also acted as financial advisor to petitioner and suggested an investment program because of the accumulation of money by the corporate petitioner. Kass set up petitioner's systems of accounting and the*31 chart of accounts for the corporate petitioner, posted journal entries to the general ledger, reconciled the bank accounts, analyzed inventory, and computed the depreciation account. Kass and Carmella were concerned with minute details regarding the bookkeeping of the corporation. On occasion, Kass had to change credits to accounts receivable on the corporation's books and records. At the close of the fiscal year ending April 30, 1958, Kass increased corporate sales by $9,500. Carmella, the corporation's bookkeeper, was with the corporation from its inception in 1949. She was the manager and supervisor of all office personnel. During the taxable period involved herein there were three girls working in the office under her immediate supervision. She had charge of the banking and prepared all the checks of the business. Carmella had gone to high school, but had no formal or academic business training. Carmella was instructed by Kass as to her bookkeeping duties. He showed her where various items belonged in the corporate books and records. During the taxable years in question she had charge of the disbursement journal and the receipts journal. Petitioner purchased real property*32 on Lake Canandaigua, New York, in 1954 which he began using as his permanent year-around residence in 1956. In July 1955 petitioner contracted with Earl J. Stephan for the construction of a dock at his home on Lake Canandaigua at a cost of $1,409. On January 10, 1956, Stephan was paid $1,000 by a check drawn on the bank account of the corporate petitioner which was signed by Burnett. The amount of this check was recorded on the corporation's books as an "advertising expense" in the fiscal year 1956 and taken as a deduction on its corporate income tax return for that year. Carmella did not know the purpose of the aforesaid check at the time it was drawn and did not know how to enter the item on the corporation's books. She had to get an explanation of this item from petitioner. On February 3, 1956, a 21-foot Chris-Craft boat was purchased from the Waldorf Boat Co., Inc. A check of corporate petitioner in the amount of $4,201.83, made payable to Waldorf, Inc., was used to pay for said boat. The amount of this check was recorded on the corporation's books as "merchandise purchase" in the fiscal year 1956 and deducted as an expense on the corporation's income tax return for that year. *33 Carmella did not know the purpose of said check at the time it was made out and did not know how to enter it on the corporation's books. She had to obtain an explanation of this item from petitioner. The check to Waldorf, Inc., was signed by the petitioner. In 1956 petitioner contracted with John Tiberio for the construction of a retaining wall as protection against the waters of Lake Canandaigua. Tiberio was paid for said work by two corporation checks, one dated January 25, 1957, in the amount of $600 and the other dated February 5, 1957, in the amount of $1,871.50. These checks were identified as "filter mfg." in the corporation's checkbook. Said amounts were shown on the corporation's books as a "subcontract expense" in the fiscal year 1957 and deducted on the corporation's income tax return for that year. Carmella did not know Tiberio or the purpose of the check. She had to ask petitioner for information as to these items. Said checks were signed by petitioner. In January 1956 petitioner contracted for the construction of a building on his property at Lake Canandaigua. Corporation checks signed by the petitioner were used to pay for this work to the extent of $9,731.82 in*34 fiscal year 1956, and $6,277.84 in fiscal year 1957. Said amounts were recorded on the corporation's books as "merchandise purchases" and deducted on the corporation's income tax returns for the fiscal years 1956 and 1957. Petitioner maintained two brokerage accounts with the firm of Merrill Lynch, Pierce, Fenner & Smith, Inc., during the years 1956 and 1957. Securities were purchased during these years in the amount of $17,215.45, which were paid for by checks of the Genesee Valley Union Trust Company, payable to the aforesaid brokerage firm dated May 14, 1956; in the amounts of $6,450, November 16, 1956, in the amount of $5,340.45, and March 18, 1957, in the amount of $5,425. Said bank checks were purchased by checks of the corporate petitioner payable to the bank as follows: DateAmountMay 14, 1956$6,450.00November 16, 19565,340.45March 18, 19575,425.00 The three checks of the corporate petitioner which were used to purchase the aforesaid bank checks were recorded on the corporation's books as "merchandise purchases" in the fiscal year 1957 and were deducted as an expense on the corporation's income tax return for said year. The three corporation checks*35 when drawn were shown in the corporation's checkbook stub as an expense for "fiberglas insulation." Carmella did not know how to record these three checks payable to the Genesee Valley Union Trust Company, and had to ask Burnett for information about said expense. The two brokerage accounts with Merrill Lynch, Pierce, Fenner & Smith, Inc., were accounts Nos. 816-11913 and 816-11914. Account No. 816-11913 was a custodian account to be transferred to petitioner's minor children. Account No. 816-11914 was designed to yield capital gains and tax exempt income. Petitioner sold securities in Account No. 816-11914 at a loss in November and December 1957. Messinger, who was a representative of said brokerage firm, dealt personally with petitioner. The corporate petitioner charged the amount of $1,591 as a pattern expense on its books for the fiscal year 1956. Said amount was credited to petitioner's personal loan account on the corporation's books for the fiscal year 1956. A check drawn on the account of the corporate petitioner in the amount of $2,224.75 dated September 30, 1955, was used to pay the balance due on a personal loan of petitioner with the Union Trust Company, Rochester, *36 New York. Said amount was recorded on the corporation's books as "merchandise purchases." Carmella knew that a corporation check was used to pay a corporate note payable or an individual note payable by asking the petitioner. The corporate petitioner failed to record on its books and to report on its income tax returns for the fiscal years ended April 30, 1956, 1957 and 1958 income from sales to the Carrier Corporation, Syracuse, New York, in the following amounts: Fiscal Year EndedAmountApril 30, 1956$ 4,500.00April 30, 195729,604.95April 30, 195840,612.84Carrier Corporation checks representing sales of the corporate petitioner to Carrier were applied to sales or credited to petitioner's loan account on the corporation's books as follows: Credited toCredited toLoan Account ofTotal AmountSales ofPetitioner onDateof CheckCorporationCorporation BooksOct. 21, 1955$ 5,257.72$ 4,257.72$ 1,000.00Nov. 7, 19557,016.645,016.642,000.00Dec. 19, 19553,305.131,805.131,500.00Sept. 6, 19562,220.00220.002,000.00Nov. 6, 195618,256.7716,256.772,000.00Apr. 30, 195717,418.169,667.797,750.37May 7, 19578,645.308,645.30May 14, 195713,748.8813,748.88June 4, 195714,977.0414,977.04July 9, 19574,990.854,990.85*37 In addition to the aforesaid Carrier Corporation checks a check of the Carrier Corporation dated April 2, 1957, in the amount of $9,997.21 was deposited in petitioner's personal account at the Rochester Savings Bank. This check from the Carrier Corporation representing sales income of the corporate petitioner was not recorded on the books of the corporation either as a deposit by petitioner or as a sales receipt of the corporation. Petitioner added a small amount of cash ($2.79) to the aforesaid Carrier Corporation check in the amount of $9,997.21, making a total amount of $10,000 which he deposited in his personal account at the Rochester Savings Bank. An officer of the Rochester Savings Bank questioned the propriety of depositing a check payable to the corporation in the personal account of petitioner. Petitioner knew that said check was being deposited in his personal account and stated that the bank should accept the check for deposit in his personal account. Said check was endorsed first with the corporation endorsement and then individually by petitioner. After consultation with the bank's attorney, the check for deposit in his personal account was accepted. In addition*38 to the Carrier Corporation checks referred to hereinabove, there were two Carrier Corporation checks payable to the corporate petitioner that were not recorded on the corporation's books, either as a sales receipt or as a deposit by petitioner. These checks representing sales receipts of the corporation were dated April 9, and 16, 1957, and were in the amounts of $9,838.76 and $5,768.98, respectively. Said checks were used by Burnett (and endorsed to Eggan Real Estate, Inc.) to purchase a plant in his own name in the Town of De Witt, a suburb of Syracuse, New York. In October 1957 Burnett had purchased said plant for the total amount of $226,127.02 from the Midler Land Development Corporation of Syracuse. Carmella typed all the checks of the corporate petitioner. She had charge of the bank deposits and she made the entries in the cash receipts journal and totalled them at the end of every month. She made out the original deposit slips and duplicate deposit slips showing deposits in the corporation account with the Genesee Valley Union Trust Company. She changed the amount of the Carrier Corporation check, as shown on the original deposit slips, so that a portion of said check appeared*39 on the duplicate deposit slips as a deposit by the petitioner in the corporation's bank account. The duplicate deposit slips were typed but were not carbon copies of the original deposit slips. Only the deposit slips which were designed to show part of the Carrier Corporation check as a deposit by petitioner were typed twice. In all other instances, carbon copies of the deposit slips were made by Carmella. Carrier Corporation checks were used because they were received by the corporate petitioner more regularly and frequently. Petitioner advised Special Agent Offen that the matter of unrecorded sales only referred to the Carrier Corporation. Petitioner would tell Carmella how much of the Carrier Corporation checks to credit to his account. In order to reconcile the amount shown on the duplicate deposit slips as received from Carrier Corporation in place of the actual amount received, Carmella had to deduct from sales to the Carrier Corporation the amount shown as a credit to petitioner. Carmella did this by reducing the total sales for the month. The amounts of checks of the Carrier Corporation credited to petitioner's "Loan Account" on the corporation's books reduced the amount*40 petitioner owed to the corporate petitioner for personal expenditures made on his account by the corporate petitioner. Any bookkeeping item for the petitioner personally was put under "Suspense." The designations "Loan Account" and "Suspense Account" for the petitioner were used interchangeably on the corporation's books. The item "office building 1958" in the amount of $3,140.74 shown in the depreciation schedule of the corporation income tax return for the year ended April 30, 1958, is not included in the items charged to "merchandise purchases" for the fiscal years 1956 and 1957 for the construction of a building on petitioner's property at Lake Canandaigua. Special Agent Milton M. Offen began his investigation in the instant cases in May 1958. Offen had his first contact with petitioner in the early part of May 1958. During the course of his initial interview with petitioner, the agent asked petitioner to supply records of his personal savings accounts and brokerage accounts. Petitioner did not supply Offen with said information at that time. As a result of his own investigation, Offen discovered that petitioner had a savings account at the Rochester Savings Bank. The agent*41 also discovered that Burnett had deposited a check of Carrier Corporation payable to the corporation in his personal account at the Rochester Savings Bank. Special Agent Offen obtained copies of all Carrier Corporation checks payable to the corporate petitioner and compared them with the records of the corporate petitioner to determine whether such payments were recorded. Offen ascertained that the duplicate deposit slips of the corporation were used as a cash receipts record. Said deposit slips contained the names of the customers who made remittances to the corporate petitioner. The original deposit slips of the corporation dated October 26, November 10, and December 21, 1955, November 8, and September 10, 1956, and May 2, 1957, show the deposit of the full amount of the Carrier Corporation checks relating to unreported sales of the corporate petitioner mentioned hereinabove, whereas the duplicate deposit slips of the same dates show that these checks were credited in part as a receipt from the Carrier Corporation and part as a receipt from petitioner. When these two amounts are added together, they represent the total of the actual check remitted by the Carrier Corporation. *42 Carrier Corporation checks payable to the corporation dated May 7, and 14, 1957, in the amounts of $8,645.30 and $13,748.88, respectively, together with $105.82 in cash, were deposited in the corporation account on May 22, 1957, for a total deposit of $22,500. The duplicate deposit slip dated May 22, 1957, shows the entire amount of $22,500 as a deposit by the petitioner. A Carrier Corporation check payable to the corporate petitioner dated June 4, 1957, in the amount of $14,977.04 was deposited in the account of corporate petitioner on June 6, 1957, together with cash in the amount of $22.96 for a total deposit of $15,000. The duplicate deposit slip dated June 6, 1957, shows the entire amount of $15,000 as a deposit by the individual petitioner. A Carrier Corporation check payable to the corporate petitioner dated July 9, 1957, in the amount of $4,990.85 was deposited in the account of corporate petitioner on July 13, 1957. The duplicate deposit slip dated July 13, 1957, shows the item in the amount of $4,990.85 as a deposit by the individual petitioner. Special Agent Offen was unable to discover the unreported income of the corporate petitioner from the documents he received*43 from petitioner. Offen was able to determine that there were unreported sales of the corporate petitioner only by contacting various third parties. Petitioner suffered from arteriolosclerosis prior to and during the taxable years involved herein. Petitioner had a history of strokes dating back to 1947 or 1948. On October 18, 1957, petitioner suffered a stroke which caused some impairment of vision, depression, vagueness and made concentrating difficult. On January 2, 1959, petitioner experienced another cerebral thrombosis or stroke which caused expressive aphasia, that is, an inability to speak properly. Notwithstanding the arteriolosclerosis, petitioner was able to carry out successfully the functions of a salesman for his corporation during the taxable years involved. Petitioner's illness was present in the summer and early fall of 1960 during the criminal proceedings against him for fraud. Petitioner's physician concluded that a trial of the criminal tax fraud proceedings constituted a threat to petitioner's life and recommended to petitioner's wife and attorney that Burnett not proceed to the criminal trial of the income tax matter. On July 27, 1960, petitioner pleaded*44 guilty to a two-count Information filed by the United States Attorney for the Western District of New York. Count one charged petitioner with knowingly and willfully attempting to evade and defeat income taxes by filing a false and fraudulent income tax return on behalf of himself and his wife for the calendar year 1957 in violation of section 7201 of the 1954 Code. Count two charged petitioner with knowingly and willfully attempting to evade and defeat taxes owing by the corporate petitioner by filing a false and fraudulent income tax return for the corporation for the fiscal year ended April 30, 1957, in violation of section 7201 of the Code of 1954. Petitioner was found guilty on his plea, sentence imposed, and judgment was entered on both counts on September 12, 1960. Petitioners in Docket No. 91655 had additional taxable income in the years 1955, 1956 and 1957 in the amounts set forth in the statutory notice of deficiency with the exception of the amounts deleted from taxable income in accordance with the Stipulation of Facts. Said additional taxable income for each of the years 1955 and 1956 not reported by petitioners was in excess of 25 percent of the gross income reported*45 by them in their income tax returns for the years 1955 and 1956, that is, $27,985 and $39,341.55, respectively. Petitioner in Docket No. 91656 had additional taxable income and unallowable deductions for each of the fiscal years ended April 30, 1956, 1957, and 1958, as set forth in the statutory notice of deficiency with the exception that certain business expenses are deductible in accordance with the Stipulation of Facts. Each of the returns of James F. Burnett, Jr., and Margaret Burnett for the taxable years 1955, 1956, and 1957, was false and fraudulent with intent to evade tax within the meaning of section 6653(b) of the Internal Revenue Code of 1954. A part of the underpayment of said petitioners in Docket No. 91655 for each of the taxable years 1955, 1956 and 1957 was due to fraud with intent to evade tax within the meaning of section 6653(b). Petitioner in Docket No. 91656 filed false and fraudulent income tax returns for the fiscal years ended April 30, 1956, 1957 and 1958, with intent to evade income taxes. A part of the underpayment of said petitioner for each of the taxable years involved was due to fraud with the intent to evade tax. Opinion*46 Issue I. Fraud of Individual Petitioners At the outset we note that the individual petitioners in Docket No. 91655 do not contest the deficiencies in tax for the calendar years 1955, 1956, and 1957, as modified by the deletion from taxable income of certain stipulated amounts. Likewise, the corporate petitioner in Docket No. 91656 does not dispute the adjustments to taxable income determined by respondent for the fiscal years ended April 30, 1956, 1957, and 1958, as modified by the allowance of certain deductions which have been stipulated by the parties. However, both the individual petitioners and corporate petitioner herein challenge the imposition of additions to tax for fraud for the years in question under section 6653(b). In essence, respondent contends that the petitioner, James F. Burnett, Jr., deliberately evaded Federal income taxes by diverting corporate sales proceeds to his personal use and by concealing and disguising on the corporation's books certain personal expenditures as business expenses. The burden of proof with respect to fraud is upon the respondent and he must establish fraud by clear and convincing evidence. Jack M. Chesbro, 21 T.C. 123, 130 (1953),*47 affd. per curiam 225 F. 2d 674 (C.A. 2, 1955), certiorari denied 350 U.S. 995. Our conclusions with respect to the issue of fraud for the taxable years involved herein are based upon a consideration of the entire record properly before us, and we are not limited to a consideration of respondent's affirmative evidence. Frank Imburgia, 22 T.C. 1002, 1014 (1954); Wallace H. Petit, 10 T.C. 1253, 1257 (1948); L. Schepp Co., 25 B.T.A. 419, 440 (1932). We recognize, of course, that fraud is not to be predicated in any respect upon petitioner's failure to meet the burden of proving error with respect to respondent's determination of deficiencies. It must be affirmatively established that each return in question was false and fraudulent with intent to evade taxes, and that a part of each underpayment is due to fraud with intent to evade taxes if additions to taxes under section 6653(b), supra, are to be approved. See Frank Imburgia, supra. We are also mindful that in this, as in many fraud cases, proof of fraud if it is to be established must depend in some respects upon circumstantial evidence. Frudulent*48 intent can seldom be established by a single act or by direct proof of the taxpayer's intention. It is usually found by surveying his whole course of conduct and is to be adduced as any other fact from all the evidence of record and inferences properly to be drawn therefrom. M. Rea Gano, 19 B.T.A. 518, 532 (1930). Our finding of an understatement in taxable income for each of the petitioners for each of the years in question for the purposes of the deficiencies involved was based upon petitioner's concession with respect thereto. We are aware that respondent cannot meet his own burden of establishing fraud on the basis of petitioner's failure to discharge the burden of proving error in the determination of deficiencies, and we do not, of course, rest our findings of fraud on that basis. We have held that a mere understatement of income does not establish fraud. James Nicholson, 32 B.T.A. 977 (1935), affd. 90 F. 2d 978 (C.A. 8, 1937). The existence of fraud with intent to evade tax must be affirmatively established. Drieborg v. Commissioner, 225 F. 2d 216, 218 (C.A. 6, 1955), affirming in part a Memorandum Opinion of this Court. *49 There must be independent evidence which shows a willful intent to evade tax. In that connection the Supreme Court in Spies v. United States, 317 U.S. 492 (1943) said at p. 499: Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation. Nor would we by definition constrict the scope of the Congressional provision that it may be accomplished "in any manner." By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. * * * After a painstaking analysis of all of the evidence in this case, and bearing in mind the above-stated principles, we are convinced that petitioner, James F. Burnett, Jr., received*50 substantial taxable income during each of the taxable years in question from his controlled corporation in excess of that reported on his joint returns for those years, and that a part of each understatement here involved was due to fraud with intent to evade taxes. It is well settled that respondent, in sustaining his burden of proof, need not prove the precise amount of the deficiency attributable to such fraud, but only that a part of the deficiency is attributable thereto. United States v. Chapman, 168 F. 2d 997 (C.A. 7, 1948), certiorari denied 335 U.S. 853. The understatements of income in each of the years involved herein were both substantial in amount and substantial in proportion to reported income. Even if this case were devoid of the usual indicia of fraud, the courts have held that consistent understatements of income in substantial amounts over a number of years by knowledgeable taxpayers, standing alone, are persuasive evidence of fraudulent intent to evade taxes. Cefalu v. Commissioner, 276 F. 2d 122 (C.A. 5, 1960); Shahadi v. Commissioner, 266 F. 2d 495 (C.A. 3, 1959); Schwarzkopf v. Commissioner, 246 F. 2d 731*51 (C.A. 3, 1957), affirming on this point a Memorandum Opinion of this Court; Bryan v. Commissioner, 209 F. 2d 822, 828 (C.A. 5, 1954), certiorari denied 348 U.S. 912; Jack M. Chesbro, 21 T.C. 123, 131 (1953), affd. 225 F. 2d 674 (C.A. 2, 1954), certiorari denied 350 U.S. 995; Rogers v. Commissioner, 111 F. 2d 987 (C.A. 6, 1940), affirming 38 B.T.A. 16; W. A. Shaw, 27 T.C. 561, 570 (1957), affd. 252 F. 2d 681 (C.A. 6, 1958); Nathan Bilsky, 31 T.C. 35, 43 (1958). In Epstein v. United States, 246 F. 2d 563 (C.A. 6, 1957), certiorari denied 355 U.S. 868, the Court stated (p. 566): The consistent understatement of large amounts of income for a number of years is evidence of willful intent to evade. Kurnick v. Commissioner, supra, 232 F. 2d 681; Drieborg v. Commissioner of Internal Revenue, 6 Cir. 225 F. 2d 216. In Holland v. United States, supra, 348 U.S. 139, * * * the Supreme Court declared that "evidence of a consistent pattern of underreporting large amounts of income" will support "an*52 inference of willfulness." As indicated above in the instant case, the correct net income for each of the years 1955 to 1957, inclusive, greatly exceeded the amount reported by petitioners. Their understatements of income were so large, regular and frequent, extending over a period of at least three years, 1955 to 1957, inclusive, that there is no escape from the inference of a deliberate intention to defraud the Government of the taxes lawfully due it. Our conclusion is the same with respect to the corporate petitioner for the fiscal years ending April 30, 1956, 1957, and 1958, inclusive. In addition to the consistent pattern of substantial understatements, the record is replete with facts and convincing circumstantial evidence which sustain the view that respondent has met his burden of establishing that the petitioners knowingly and intentionally evaded their taxes for the taxable years involved herein. Without suggesting that the following discussion is at all complete, we merely advert to the following indicia of fraud. Preliminarily, we note that Burnett was in full control of the business of the corporate petitioner during the taxable years under review as its president, *53 treasurer, and sole stockholder. Burnett, in order to obtain funds for his personal use without reporting the money as taxable income, devised a plan whereby certain payments made by the Carrier Corporation of Syracuse, New York, on purchases by it from the corporate petitioner, were credited either in whole or in part to his loan account on the books of his corporation. Petitioner also made substantial withdrawals from the corporation during the years involved herein. Said withdrawals which were charged to his loan account were then satisfied by applying the unreported sale receipts of the corporate petitioner as a credit to his account. In essence, this concealment of taxable income was accomplished by having Carmella, the bookkeeper, make a duplicate deposit slip for the corporate petitioner's bank account on which certain checks received from the Carrier Corporation would be shown either in whole or in part as a deposit by petitioner. Since the full amount of the Carrier Corporation checks would be listed on the original deposit slip, it would appear that all of the sales receipts were being deposited properly in the corporate account. Burnett concedes the amount of the unreported*54 sales to the Carrier Corporation and the amount that was applied to his loan account. Petitioner does not dispute the fact that the amounts of unreported sales to the Carrier Corporation which were credited to his loan account constitute taxable income to him. By applying a portion of the sales receipts from the Carrier Corporation to his own credit on the books of the corporate petitioner, Burnett not only reduced the taxable income of the corporate petitioner, but he was able to withdraw funds from the corporation for his personal use and benefit without reporting such funds as taxable income. While Burnett does not contest respondent's determination with respect to additional taxable income resulting from unreported sales, he contends that there was no "conscious wrongdoing" on his part or intent to defraud the Government by his failure to report such income because he did not participate in or direct the keeping of the corporate books and records. We find petitioner's contention without merit.Carmella, the bookkeeper for the corporate petitioner, testified that Burnett told her how much of the Carrier Corporation checks should be shown by her on the corporation deposit slips*55 as a payment by him on his loan account. 2 Further evidence of petitioner's actual knowledge that certain checks of Carrier Corporation were not properly reported as sales income is evidenced by his statement to Special Agent Offen to the effect that only Carrier Corporation checks were used for this purpose. This fact was confirmed by Carmella who testified that Carrier Corporation checks were used because they were received more regularly and frequently. It is apparent that petitioner was credited with large deposits (credits to his "Loan Account" or "Suspense Account") on the corporation*56 books for sums which he never reported as income. By this method of concealment he had the use of these funds without paying a tax thereon. It is doubtful that Carmella on her own would conceive of such a method of accounting for the proceeds of the Carrier Corporation receipts. The amounts involved are too large to be the result of inadvertence or negligence, as petitioner avers. In our view, the practice of manipulating the duplicate deposit slips continuing over three taxable years manifests a deliberate plan to evade the payment of income taxes. Moreover, we are convinced that said plan was employed with the knowledge and consent of petitioner. See 57 Herkimer Street Corporation v. Commissioner, 316 F. 2d 726 (C.A. 5, 1963), affirming per curiam a Memorandum Opinion of this Court. In addition to the aforesaid checks, which were wrongfully appropriated by Burnett to his own use by having improper entries made on the duplicate deposit slips, he used certain other Carrier Corporation checks without reporting the amounts thereof as income either to himself or to the corporation. Thus, Burnett used a Carrier Corporation check in the amount of $9,997.21 to make a deposit*57 in the sum of $10,000 in his personal account at the Rochester Savings Bank. In this connection petitioner's actual knowledge and complicity in the fraudulent appropriation of corporate sales receipts to his own use is established by the testimony of Schmid, an official of the Rochester Savings Bank. Schmid testified that he discussed with Burnett the propriety of depositing a check payable to the corporate petitioner in his personal account. The matter was referred to Schmid by the teller because it was rather an "unusual request" to deposit a check made payable to a corporation to an individual account. In his conversation with Schmid, petitioner stated that it was his intention to deposit this check in his personal savings account, that it was his practice to do so and that he was the company. Said check, representing a sales receipt of the corporate petitioner in the amount of $9,997.21, was not recorded on its books. Also, petitioner appropriated to his own use two other checks of the Carrier Corporation which were payable to the corporate petitioner dated April 9, and 16, 1957, in the amounts of $9,838.76 and $5,768.98, respectively. Said checks were used by petitioner to acquire*58 certain property in his own name in De Witt, New York. These two checks, like the aforesaid check in the amount of $9,997.21 deposited in his personal account, were taken directly by Burnett and were not recorded on the books of the corporate petitioner nor deposited in the corporation's bank account. In our view, if Burnett intended the transactions relating to the Carrier Corporation checks to be loans, as he contends, we believe he should have insured that the corporate records so reflected them. Otherwise, the corporate petitioner would never ascertain what amounts were owed to it. Manifestly, where, as here, substantial amounts are charged to a personal loan account at the instructions of the sole stockholder and principal officer, we may infer that additional items not so charged because he gave no such instructions, were not intended to be and were not loans. United States v. Durant, 208 F. Supp. 890, 894-895 (N.D. Ill. 1962). Considering the unorthodox manner in which the Carrier Corporation checks in question were handled by Burnett and his bookkeeper, we must conclude that the amounts credited to petitioner on the books of his corporation were constructively*59 received by him. In addition to the scheme whereby Burnett diverted corporate sales receipts to his own use, he also withdrew funds from the corporate petitioner for his personal use under the guise of business expenses. A myriad of strictly nonpurchase items are entered on the corporation's books as "merchandise purchases." These items, like the unreported sales, appear in all the taxable years under review. Knowledge of the petitioner with respect to these expenditures is clearly demonstrated by the testimony of Carmella. She testified that these expense items were charged as specific business expenses pursuant to the instructions of Burnett and that her only way of knowing the purpose of these items was to obtain the information from him. We believe that the instances in which personal items were charged to the corporate petitioner are too numerous to be due to honest error or inadvertence. Moreover, the manner in which these items were reflected on the corporation books was obviously designed to conceal their true character. Petitioner's intention is evident when he charged the cost of building a dock at his home on Lake Canandaigua to the corporate petitioner as an "advertising*60 expense." Likewise, we note that when he paid Tiberio for the construction of a retaining wall to protect his home and property from the lake waters he used corporation checks in the amounts of $600 on January 25, 1957, and $1,871.50 on February 5, 1957. These expenditures were identified on the corporate checkbook stub as "filter mfg." In the same manner a 21-foot Chris-Craft was charged to the corporate petitioner as "merchandise purchase." While the boat was purchased from the Waldorf Boat Co., Inc., the corporation's check was made payable to Waldorf, Inc., in an apparent effort to conceal the true nature of the expenditure. Petitioner, on brief, avers that he told Carmella to charge the cost of the boat to the corporate petitioner since it was for corporate use, but that he did not tell her how to enter this item on the books. In our opinion the boat was used primarily for the personal use of petitioner and his family. We believe that Burnett directed his bookkeeper to charge the boat to his corporation as "merchandise purchase." Additional indicia of fraud are found in the deceptive procedure employed by Burnett to avoid detection of his use of corporate funds for the purchase*61 of securities in his individual capacity from a brokerage firm. Rather than have his corporation draw a check or checks to the brokerage firm which might easily be detected, Burnett had corporate checks drawn to the order of the Genesee ValleyUnion Trust Company which, in turn, were used to purchase bank drafts payable to the brokerage firm. The purpose of the corporate checks drawn to the order of the bank was identified on the corporate checkbook stub as "Paid for fiberglas insulation." Carmella testifed that she made the entry on the checkbook stub, but that she would not know what a check payable to the bank was for unless she asked Burnett for such data. The record shows that Burnett not only failed to advise his subordinates that any of the items in question (such as the dock, foundation, boat and securities) were personal, but he specifically told Carmella how the expenses were to be entered on the corporate accounts. We have had the opportunity to see and hear both witnesses and to analyze their testimony in the light of the entire record. We have no doubt that Carmella's testimony was true. We have reached the conclusion that Burnett's testimony is not to be believed independently*62 of the fact that he was convicted in the United States District Court for the Western District of New York on plea of guilty on two counts of an Information charging income tax evasion for the taxable year 1957. See Lillian Kilpatrick, 22 T.C. 446 (1954), affd. 222 F. 2d 240 (C.A. 5, 1955). The main thrust of petitioner's position is that the maintenance of the corporate books and records was entrusted to Carmella, his bookkeeper, and a qualified accountant on whom he relied completely; that the handling of the various items in controversy on the books and records and ultimately on the tax returns were the acts of these individuals alone and were done without his advice, knowledge and consent. In the same vein, petitioner urges that because of his illness, the phenomenal growth of his business, and his exclusive concentration on outside sales activities, he did not participate in the mechanics of bookkeeping or direct the keeping of the corporate books and, therefore, he did not have the requisite intent to defraud the Government with respect to his tax for the years in question. In essence, petitioner contends that he relied on his accountant to ascertain*63 that the books of the corporation properly reflected its financial affairs and that the accountant's failure to do so "brought about the present fraud charge." It is axiomatic that taxpayers cannot escape responsibility for errors, not otherwise excusable, by shifting the blame to those who handle the books and records or prepare the return. M. Rea Gano, 19 B.T.A. 518, 533 (1930); D. C. Clarke, 22 B.T.A. 314, 328 (1931) and Sol H. Goldberg, 36 B.T.A. 44, 53 (1937). This would be particularly true where important data was withheld from the preparer of the return or wrong information was given to him. Russell C. Mauch, 35 B.T.A. 617 (1937), affd. 113 F.2d 555 (C.A. 3, 1940); Estate of E. A. Wickham, 22 B.T.A. 1393, 1398 (1931), affd. 65 F. 2d 527 (C.A. 8, 1933). As already indicated, we are convinced that the failure of Burnett to report all of his income in his returns for the taxable years 1955, 1956 and 1957 was consciously fraudulent. Under the circumstances, the manipulations discussed hereinabove cannot be justified on the theory that Burnett had entrusted the bookkeeping of the corporate*64 petitioner and the preparation of the returns in question to others. Although Burnett did not maintain the books and records personally, he did concern himself to the extent that he advised his bookkeeper as to the nature of certain personal items of expense so that she would know how to charge them to the corporation. Moreover, every item of personal expense involved herein was paid by a corporation check that was signed by petitioner. Hence, he was aware that personal expenses were being paid by corporation checks. We find no merit in petitioner's argument that Carmella had no experience or formal training in bookkeeping or accounting. While she lacked academic training at the time she was hired in 1949, during the period under review she had been employed as a bookkeeper for about five years and had been trained in her duties by the accountant Kass. Upon our analysis of the whole record, we cannot accept petitioner's argument that the misuse of corporate funds was due to bungling on the part of the accountant Kass. On the other hand, the record supports the view that Burnett had ample intelligence to realize that the income which he was reporting on his returns was not all*65 that he should have reported in each taxable year. The evidence as a whole, in clear and convincing fashion, shows a pattern of deliberate omission of a large part of his income for each taxable year involved herein. If Burnett was so oblivious to his responsibilities as a taxpayer (which we do not believe), his failure to his duty and his disregard of the requirements of the law have placed him in an onerous position for which he alone is responsible. It is well settled that a taxpayer owes a duty to his Government to pay more than scant attention to his business records and he cannot insulate himself from liability for additions to tax for fraud by claiming preoccupation with business affairs or shifting the blame to his employees. Of course, in unusual circumstances, not present here, we have considered these factors as mitigating circumstances. We believe that the views expressed in Cooper v. United States, 9 F. 2d 216 (C.A. 8, 1925) are here pertinent. The Court said (p. 222): But it is claimed that knowledge on the part of the defendants of the contents of the returns is not shown; that they may have been made up by employees, without personal knowledge on*66 the part of the Coopers. It was shown that defendants were the sole owners of the corporate stock. The corporation was a family affair. They were in sole and entire charge of the business; upon them was enjoined the duty of making these returns under oath. The owner of a business need not be the actual bookkeeper, to be familiar with the affairs and finances of that business. It would present a somewhat startling situation if a taxpayer, charged by law with this duty, could sign and file a false return, made to defraud the government, and escape punishment by disclaiming knowledge of that which he has sponsored. Of course, he would not be liable for innocent clerical mistakes; but he must be held to know that which it is his duty to know, and which he solemnly promulgates. We do not by this recognize imputed or presumed knowledge or intent. We merely hold that the situation presented is one from which the jury was entitled to infer knowledge on the part of the defendants. To the same effect see Harber v. Commissioner, 249 F. 2d 143 (C.A. 6, 1957), affirming per curiam a Memorandum Opinion of this Court, certiorari denied 355 U.S. 955; United States v. Durant, 208 F. Supp. 890 (N.D. Ill. 1962).*67 Viewing the record in its entirety, we are convinced that petitioner actively participated in the scheme to evade personal income taxes by concealing corporate income which he diverted to his personal use. The method used by petitioner to evade income taxes follows the same pattern in all the taxable years involved herein. The failure to report substantial amounts of income during each of the taxable years involved herein under circumstances indicating that Burnett knew these omitted amounts were taxable to him cannot be ascribed to oversight or incompetence of subordinates, but, we believe, justifies the conclusion that at least a part of the underpayment for each of the taxable years 1955 through 1957, inclusive, is due to fraud with the intent to evade tax. Charles A. Rogers, 38 B.T.A. 16, 23 (1938), affd. 111 F. 2d 987 (C.A. 6, 1940); Charles E. Mitchell, 32 B.T.A. 1093, 1129 (1935), affd. sub. nom. Helvering v. Mitchell, 303 U.S. 391 (1938). For the taxable year 1957 petitioner was convicted of willfully attempting to evade his income tax by means of filing a false and fraudulent income tax return in violation of section*68 7201, supra. Respondent, relying on Nathan Goldsmith, 31 T.C. 56, 64 (1958), contends that petitioner's admission that he deliberately and knowingly filed a fraudulent return for 1957 is evidence that he intentionally filed a fraudulent return for that year. Petitioner, in opposition, urges that because of his serious illnes prior to the criminal trial, his physician recommended that he not proceed to trial and, therefore, that his admission of guilt was without substance. As indicated, supra, we have reached the conclusion of fraud on the part of Burnett for the taxable year 1957 independent of the fact of Burnett's conviction, on plea of guilty, to charges of income tax evasion for 1957. Since the issue of collateral estoppel is not raised in this case, we have no occasion to consider the impact of such recent cases as John W. Amos, 43 T.C. 50 (1964) and Arctic Ice Cream Company, 43 T.C. 68 (1964). See also Arthur D. Thomson, 42 T.C. 825, 831-832 (1964). We note for completeness that while the medical testimony shows that Burnett was ill during the taxable years, there is no contention or testimony before the Court that he was*69 non compos mentis at the time the returns in question were executed and filed, or did not know right from wrong, or was not aware of the significance of his actions. Emanuel Hollman, 38 T.C. 251, 260 (1962); Fred W. Staudt v. Commissioner, 216 F. 2d 610 (C.A. 4, 1954), affirming per curiam a Memorandum Opinion of this Court. Further, in support of his primary position, petitioner relies, inter alia, on Eagle v. Commissioner, 242 F. 2d 635 (C.A. 5, 1957), reversing in part 25 T.C. 169 (1955); Wiseley v. Commissioner, 185 F. 2d 263 (C.A. 6, 1950), reversing 13 T.C. 253 (1949); and Griffiths v. Commissioner, 50 F. 2d 782 (C.A. 7, 1931), reversing 15 B.T.A. 252 (1929). We have carefully considered these cases and find them all distinguishable from the instant case on their facts. In Eagle v. Commissioner, supra, all business transactions of the taxpayer were handled through the bank, with all receipts either being deposited to his checking account or credited as note payments. Unlike the case at bar, there is no evidence in Eagle that the taxpayer used unreported sales*70 receipts for his personal use. Also, the taxpayer in Eagle was responsible for instigating the audit of his returns by the Government when it was first brought to his attention that errors may have been committed by the attorney he had employed to prepare his returns. In Wiseley v. Commissioner, supra, it is suffice to note that the taxpayer, knowing that his income tax returns had only been estimated and realizing that he was in difficulty because of the understatement of his income, secured assistance of friends in procuring personal auditors for his books as soon as possible after he found out from an employee that his income had been greatly understated. He then filed amended returns to correct the originals. In Griffiths v. Commissioner, supra, the taxpayer was a very old man and had no knowledge of the bookkeeping department of his firm. There was no evidence of intentional concealment of facts upon the part of the taxpayer, and the return showed, aside from the tax sought to be recovered, that he had erroneously charged himself with several thousand dollars more than was owing by him. In the light of the foregoing, and the record as a whole, we*71 are convinced that at least a part of the underpayment for each of the taxable years 1955, 1956, and 1957, of the individual petitioners was due to fraud with intent to evade tax as determined by the respondent. Jack Chesbro, 21 T.C. 123 (1953), affd. per curiam 225 F. 2d 674 (C.A. 2, 1955), certiorari denied 350 U.S. 995 (1956). Issue II. Fraud of Corporate Petitioner James F. Burnett, Jr., the individual petitioner herein, controlled the corporate petitioner as its sole stockholder, president and treasurer. There were no other officers of the corporation with the exception of his wife who is reported as a part time vice president in one year. As set forth in our Findings of Fact in extenso, Burnett used corporate funds in substantial amounts for personal matters, and also diverted to his use certain sales receipts of the corporate petitioner. As a result of Burnett's manipulations with corporate funds, the corporate petitioner failed to report income on sales to the Carrier Corporation in the fiscal years ending April 30, 1956, 1957, and 1958, in the amounts of $4,500, $29,604.95, and $40,612.84, respectively. While Burnett freely admits*72 that income from sales to the Carrier Corporation was not reported by the corporate petitioner, and does not dispute many of the items of personal expense that he charged to the corporation, he contends that the understatements of taxable income in each fiscal year involved was not due to a fraudulent intention but rather was caused by the negligence of his bookkeeper and accountant. For reasons expressed hereinabove in Issue I, the substantial amounts of sales receipts not reported by the corporate petitioner over a period of three years cannot be attributed to mere oversight or incompetence of employees. See 57 Herkimer Street Corporation v. Commissioner, 316 F. 2d 726 (C.A. 5, 1963), affirming per curiam a Memorandum Opinion of this Court; M. Rea Gano, 19 B.T.A. 518, 533 (1930). We add that we have reached our conclusion of fraud independent of the fact that Burnett also entered a plea of guilty to the charge of willfully and knowingly attempting to evade and defeat taxes owing by the corporate petitioner by filing a false and fraudulent return on behalf of the corporation for the fiscal year ended April 30, 1957. See Nathan Goldsmith, supra.*73 Considering the record as a whole, and particularly the steps taken by Burnett, the sole stockholder, to divert corporate income to his personal use, and the numerous false entries on the corporate books and records made at his direction, the conclusion is inescapable that income tax returns filed by the corporate petitioner for each of the taxable years involved herein were false and fraudulent with the intent to evade tax. At least a part of the underpayment in each of the taxable years in question is due to fraud with the intent to evade tax and the additions to tax provided in section 6653(b), supra, are to be applied. Issues III and IV. Statute of Limitations Having found that the individual petitioners in Docket No. 91655 filed false and fraudulent returns for each of the years 1955 and 1956, and that the corporate petitioner in Docket No. 91656 filed false and fraudulent income tax returns for each of the fiscal years ended April 30, 1956, and April 30, 1957, we hold that the statute of limitations is not a bar to the assessment and collection of the taxes due for any of said years. Section 6501(c)(1) of the 1954 Code. In addition, we note that the provisions of section*74 6501(e)(1)(A) of the 1954 Code are applicable to the joint returns filed by the individual petitioners for the years 1955 and 1956 since the additional unreported taxable income conceded by petitioners in said years is in excess of 25 percent of the gross income reported for those years. Decisions will be entered under Rule 50. Footnotes1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.↩2. Carmella testified on direct examination as follows: Q. How would you know the amount to credit Mr. Burnett's account if we just take, for instance, the first deposit slip in which you credit $1,000.00 of a total check of $5,000.00? A. He would tell me. * * *Q. He would tell you the amount? A. Yes. Q. Now, Mrs. Decker, what would you do with that payment credit there of $1,000.00 after you made out the duplicate deposit slip; what would be your next step? A. I would put it under the cash received and break it down to Burnett, Jr., a thousand dollars Suspense. * * *↩